**Olen (Allen) LEE, Appellant,**

v.

**Nathan HABIB, Appellee.**

**Olen LEE, Appellant,**

v.

**Nathan HABIB, Appellee.**

**Nos. 22203, 22204.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 26, 1969.

Decided Jan. 22, 1970.

Mrs. Florence Wagman Roisman, Washington, D. C., with whom Mrs. Patricia M. Wald, Washington, D. C., was on the brief, for appellant.

Mr. Herman Miller, Washington, D. C., for appellee.

Mr. John D. Hawke, Jr., Washington, D. C., filed a brief on behalf of the American Civil Liberties Union Fund, as amicus curiae.

Before WRIGHT, LEVENTHAL and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellant Olen Lee brings these appeals from two decisions of the District of Columbia Court of Appeals involving the power of that court to order a free transcript for the use of an indigent civil litigant on appeal. We hold that both the DCCA, despite its own assertions to the contrary, and the trial judges of the District of Columbia Court of General Sessions do have that power. We remand to the trial court to determine in the first instance whether a transcript should be furnished for appeal in this case.

## I. THE PROCEEDINGS BELOW

On March 23, 1967, Nathan Habib leased the premises located at 428 11th Street, S.E., Washington, D. C., to appellant Olen Lee. Subsequently Lee became delinquent in paying the rent. Habib brought suit for possession[1] of the premises on July 10, 1967, in the Court of General Sessions. Lee did not appear in court, and the Court of General Sessions entered judgment by default for plaintiff Habib on September 27, 1967. When notified by Habib that he had to quit the premises, Lee obtained counsel, filed an answer to Habib's complaint, and filed a motion for relief from the default judgment.[2] In an affidavit filed in support of his motion for relief from the default judgment, Lee argued that his failure to appear in court was excusable and that he had a defense to the action which, if accepted, would bar all or part of Habib's claims. According to his affidavit, Lee did not appear in court because he had given Habib ten dollars on account just before the scheduled date of the trial. Lee further alleged that Habib had told him there would be no need to appear in court—the payment on account was enough to satisfy Habib.

Judge Malloy of the Court of General Sessions held an extended hearing on October 4 concerning Lee's motion for relief from the default judgment. At that hearing Habib, Lee and Lee's wife apparently testified in some detail. Judge Malloy accepted Habib's version of the facts and denied the motion for relief. From that decision Lee filed a notice of appeal to the DCCA. That court granted appellant's motion to proceed in forma pauperis, without prepayment of fees, and also granted his motion to stay the eviction pending the outcome of the appeal on condition that Lee make further rent payments to Habib as they became due. The rest of the procedural background is somewhat complicated.

The rules of the DCCA spell out a specific timetable for filing various pleadings and papers. According to Rule 27, an appellant must file a notice of appeal not more than ten days after the entry of the judgment or order appealed from.[3] That time limit, according to the rule, cannot be waived.[4] The trial judge denied Lee's motion to set aside the default judgment on October 4, 1967. The notice of appeal to the DCCA was filed on October 6, 1967, clearly within the prescribed time limits.

Not more than five days after the notice of appeal is filed, the appellant must file a "designation of record and statement of errors."[5] This document should have been filed October 12, but Lee did not file it until October 19, one week

---

1. 45 D.C.Code § 910 (1967).

2. General Sessions Court Civil Rules 55(e), 60(b). Cf. Thorpe v. Thorpe, 124 U.S. App.D.C. 299, 364 F.2d 692 (1966) (construing similar provisions of the Federal Rules of Civil Procedure).

3. DCCA Rule 27(a).

4. DCCA Rule 27(q).

5. DCCA Rule 27(f).

later. Ten days after the notice of appeal is filed, the appellant must file either a statement of proceedings, or a transcript, or an agreed statement on appeal.[6] Appellant never did file a transcript of the proceedings below. Instead, on October 26, 1967, ten days after the transcript or an agreed substitute was due, Lee filed a motion with Judge Malloy of the Court of General Sessions asking the court to provide a free transcript because effective appeal would be impossible without the transcript, and because Lee could not afford to purchase one himself. The trial judge reserved decision on the matter.

Thus, on October 30, the notice of appeal had been properly filed in the DCCA. Lee had filed the designation of record and had moved for a free transcript, but Judge Malloy had not ruled on the transcript motion. At this point Habib filed with the DCCA a motion asking that court to docket and dismiss Lee's appeal because of appellant's late filings and because no "application [was] made on or before the [timely filing] dates for any extension of time." Lee filed a brief in opposition to Habib's motion to dismiss. On November 7, 1967, the DCCA, without opinion, denied Habib's motion to dismiss. Early in December Habib renewed his motion to dismiss, after the stay pending appeal had been dissolved because Lee had failed to meet one of the conditions of that stay. Habib again pointed out to the court that appellant had been late in complying with the rules and had never filed motions to extend the time for filing. One week later, on December 13, the DCCA denied Habib's second motion, without opinion.

In the meantime, the trial judge had taken no action on Lee's motion for a free transcript, which was still pending before him. Finally, on May 6, 1968, he denied the motion. Lee then appealed that denial to the DCCA. His appeal from the denial of the free transcript was dismissed by the DCCA on May 21. Lee then lodged a petition in this court on May 29 for leave to appeal from this action of the DCCA. Meanwhile, on May 20, Habib had filed a third motion with the DCCA asking that court to dismiss Lee's appeal from the refusal of the trial judge to reopen the default judgment. The DCCA granted this motion on May 24, 1968, without any indication of its reasoning. Lee also petitioned this court for leave to appeal this second DCCA order.

This court consolidated Lee's two appeals from actions of the DCCA and granted his petitions for leave to appeal. We then remanded the causes to the DCCA for an explanation of the reasons for dismissing the appeal. On remand the DCCA cited failure to comply with its Rule 27. It also held that it knew of no authority by which it could order a free transcript in this case.

On appeal to this court, after the remand, appellant argues that the DCCA should not have dismissed his appeal for failure to comply with a procedural rule where there is strong merit to the appeal and where no party was prejudiced by the delays in complying with the rule. Appellant further urges this court to hold that courts do have the authority to order a free transcript for an indigent civil litigant on appeal.

Appellee repeats his objections made below and argues that dismissal of the suit for failure to comply with the formalities was perfectly proper. In addition, he argues that this court does not have jurisdiction over the appeal because the petition for leave to appeal in one of the two consolidated causes was filed one day too late in this court. For the reasons noted below, we hold that the appeal was timely filed in this court, and that the DCCA should not have dismissed the appeal. We then reach the transcript issue.

## II. LODGING THE APPEALS IN THIS COURT

Appellee first argues that appellant's petition to this court for allowance of an

6. DCCA Rule 27(h).

appeal was filed too late. As we have already pointed out, two appeals to this court were taken by Lee. It is uncontroverted that the first appeal was properly filed within the ten-day limit.[7] The decision of the DCCA denying the motion for a transcript was entered on May 21, 1968. Appellant lodged his petition for review with this court on May 29, less than ten days later.[8] Appellee is objecting, however, to the second filing in this case. Three days after the DCCA denied Lee's motion for a transcript, it also dismissed the appeal from the trial court's refusal to reopen the default judgment, and the petition to review this second order was filed one day late in this court.[9]

■ The issue raised by the late filing of a second petition in this case has already been before this court. In February 1969 appellee Habib moved to dismiss this appeal because of late filing of a second petition for allowance of an appeal. That motion was denied, without opinion, by a motions panel of this court. We follow the lead of that panel. The two petitions here are inextricably bound together; they involve the same parties and the same controversy. The transcript issue, which was presented to us by the timely petition, was essential to the final determination of the cause. The DCCA subsequently dismissed the appeal on the merits partially because no transcript had been filed. The first appeal had thus presented this court with the transcript issue, an issue essential to the proper determination of the whole cause

by the DCCA. The alleged procedural problem presented by appellee stems only from the fact that the court below disposed of the matter in two motions instead of one. Under the circumstances, we see no reason to disturb the conclusion already reached by this court. A one-day-late notice of appeal from a second order in the same cause does not preclude us from reaching the merits of the cause on the basis of the petition already properly before us.

## III. THE DECISION BY THE DCCA DISMISSING THE APPEAL

On remand to clarify its decision dismissing the appeals, the DCCA gave the following explanation:

"Respondent's motion to dismiss was granted for the reasons that petitioner failed to comply with Rule 27(f) and 27(h) of this court, that petitioner failed to show good cause or to give an adequate explanation for his failure to comply with our Rules, and that petitioner has not once requested of this court an extension of time under Rule 27(q) in which to comply with the Rules despite respondent's repeated motions to dismiss on that ground." [10]

■ Rule 27(q) of the Court of General Sessions provides in relevant part: "There shall be no enlargement of the time for taking any of the other steps above enumerated, except by this court, or a judge thereof, and for extraordinary reasons." The DCCA, or any individual judge, thus clearly had the power to ex-

---

7. 17 D.C.Code § 103 (1967).

8. While the actual filing by the clerk took place more than ten days after the decision, the petition was lodged with the clerk within the ten-day limit. The clerk could not file the petition until this court had passed on appellant's motion to proceed *in forma pauperis*. The lodging of the petition tolled the ten-day limit. *See* Johnson v. United States, 132 U.S.App. D.C. 4, 5 n. 6, 405 F.2d 1072, 1073 n. 6 (1968).

9. While appellee argues that this failure is jurisdictional, precluding this court from extending the time for good cause

shown, we need not decide that issue in this case.

10. The court went on: "Petitioner's motion for reporter's transcript at no cost to him was denied for the reasons that this court is aware of no authority that entitles an appellant in this court in a civil action to a free transcript, and this court is aware of no authority it has to impose the cost of a free transcript for one party in a civil action on the other party, on the United States, on the District of Columbia, or on the individual reporter." These contentions are discussed in Part IV, *infra*.

tend the time limits for filing the papers involved in this case. Furthermore, we have held that it can be reversible error for the court to refuse to allow late filings under certain circumstances.[11] But we need not decide whether the DCCA abused its discretion in this case since we conclude that by its rulings denying motions to dismiss the court had effectively allowed the late filings already made by appellant.

■ On October 30, 1967, appellee Habib moved to docket and dismiss Lee's appeal to the DCCA for failure to comply with Rule 27's procedural requirements. Appellant filed a brief in opposition. He pointed out that Habib could not be prejudiced by any delay since the stay of the eviction had been predicated on an agreement that Lee would make future rent payments to Habib as they became due. Lee's counsel filed an affidavit explaining that late filing was occasioned by her lack of familiarity with the rules of the court and her preoccupation with obtaining a stay of the eviction pending appeal. Lee also argued that delays in filing such subsidiary papers should not result in automatic dismissal, that the court should consider the reasons for the delays and the issues presented by the appeal in exercising its discretionary power to allow the late filings. Faced squarely with a request to dismiss for late filing and only that issue, the DCCA denied the motion to dismiss. We hold that the denial of the motion to dismiss amounted to a grant of an extension of time to file. Our view is confirmed by the DCCA's refusal to grant a second motion of Habib to dismiss the appeal for essentially the same reasons.

Appellee has argued and the DCCA stated on remand that appellant should have made a formal motion for an extension of time to file under Rule 27(q). While we agree that in the usual case a formal motion would be preferable practice, the rule nowhere requires such a formal motion.[12] Before Habib's first motion to dismiss, Lee had completed his filings. He had filed the designation of record and statement of errors. Of course, he had not filed a physical copy of the transcript at this time. He had, however, taken steps to obtain the transcript by moving in the trial court to obtain a free copy.

■ It would seem totally superfluous to require appellant to make a formal motion for extension of time after the documents in question had already been filed, and after the DCCA had refused to dismiss the appeal because of the late filings.[13] The DCCA, by twice refusing to dismiss Lee's appeal on the sole ground that these papers had been filed late, in effect exercised its discretionary power to allow the late filings. It could not give a different cast to those rulings without at least alerting Lee that something more was required if his appeal was to be maintained.

## IV. FREE TRANSCRIPTS FOR INDIGENT CIVIL LITIGANTS

Since we hold that the appeal should not have been dismissed for the late filing, the DCCA's ruling that it was without power to authorize a free transcript must be faced. We first consider the practical importance of a transcript to an appellant; next we consider whether there might be equal protection objections to denying transcripts to those who cannot afford them. Finally, we examine the applicable statutes to see whether there presently exists authority for allowing a court to order a free transcript for an indigent civil litigant on appeal.

11. Winter v. Crowley, 126 U.S.App.D.C. 103, 374 F.2d 317 (1967).

12. The rule states that the court or any of its judges may extend the time limits "for extraordinary reasons."

13. On the assumption that a formal motion should have been made, we would construe appellant's complete, factually detailed briefs in opposition to Habib's motions to dismiss as satisfying the formal motion requirement.

## A. *The Need for a Transcript.*

There can never be effective appellate review if the reviewing court is not able to obtain a clear picture of the precise nature of the alleged errors in the court below. At the same time in an adversary system—and especially in civil cases—we must rely on counsel to weed out extraneous matter and present only the relevant portions of the proceedings below on appeal. The detail in which the proceedings below must be recounted varies, of course, with the nature of the case and the claims on appeal. The rules of the DCCA, as do the rules of all appellate courts, allow some flexibility in this regard. According to Rule 26, an "agreed statement on appeal" can be utilized whenever "the questions presented by an appeal can be determined without an examination of all the pleadings, evidence and proceedings in the trial court." [14] In the usual case a "statement of proceedings and evidence" must be presented on appeal. This document must include "such portion of the proceedings and evidence as is necessary fully and clearly to present the rulings of the trial court in which error is claimed."[15] The rule explicitly requires the appellant to include the complete charge of the judge to the jury whenever any part of that charge is challenged.

The DCCA has repeatedly emphasized in its decisions as well as in its rules that in some instances at least a detailed record of the proceedings below is essential if the reviewing court is to be able to perform its assigned tasks. The appellant bears the burden of providing a record which will amply illustrate all of the alleged errors which he wishes to press upon the reviewing court. The DCCA's predecessor, in Brown v. Plant, dismissed an indigent's appeal, holding that adequate review of the case was impossible without a transcript. The court said: [16]

" * * * We have repeatedly held that in order for this court to pass upon the alleged errors of law, a proper record must be presented and this responsbility cannot be shifted to either the trial court or this court."

It is clear, of course, that in some cases almost no record of the proceedings below will be required. If, for example, the only issue on appeal is the proper construction of a statute in light of the facts as stipulated by the parties and found by the trial court, we would not need to have a complete statement of all the lower court proceedings. But procedures adequate for one case will be found lacking under other circumstances. Often the result on appeal will depend on a precise analysis of the testimony presented at trial.[17] This is especially so when we are asked to judge the sufficiency of the evidence.

There are, then, two alternatives. The appellate court can be presented with either a transcript or a statement of evidence based on the notes of counsel and the court. Such notes, however, are not inherently reliable, no matter how com-

---

14. DCCA Rule 26.

15. DCCA Rule 23.

16. Brown ,v. Plant, D.C.Mun.App., 157 A. 2d 289, 291 (1960).

17. As this court said in Holmes v. United States, 127 U.S.App.D.C. 332, 338–339, 383 F.2d 925, 931–932 (1967) (supplemental opinion) :
"Not infrequently appellant contends that the judgment is not supported by the evidence, and in that case he is required to print 'all material portions of the testimony and evidence.' D.C. Cir. Rule 16(a).

"However other errors which on their face do not relate to the evidence are appraised by the court in the light of the evidence. They cannot be judged in a vacuum. A charge must conform to the evidence adduced, alleged errors in the receipt or exclusion of evidence must be assessed in factual context, and error which might be prejudicial in a close case does not call for reversal in a strong one. These considerations * * * indicate the benefit that inures to the court as well as to counsel from a complete transcript."
(Footnotes omitted.)

plete they may appear.[18] In addition, reconstructions of the events from such notes cannot convey subtle nuances of meaning which may be very important in the analysis of the available testimony. We have already recognized in a criminal appeal that this substitute for a transcript will in many cases prove to be inadequate.[19] We conclude, therefore, that in some civil cases as well a verbatim transcript of the portions of the trial alleged to contain error will be required if the appellant is to receive a full measure of justice. In some cases there simply can be no effective substitute for the transcript of all or part of the actual proceedings in the trial court.

Unfortunately, many litigants, in civil as well as criminal cases, who attempt to attack the proceedings below in some detail are unable to afford the transcript which is necessary for their appeal. Therefore, we cannot escape the conclusion that those who are able to purchase transcripts on appeal will, in some cases, receive a more meaningful review of the actions of the court below than will those who cannot afford it. The question arises whether this discrimination based on the civil litigant's ability to pay affronts the concept of equal protection in the constitutional sense. While we do not

have occasion to decide that issue in the context of this litigation, we feel it important to illuminate the obvious constitutional difficulties in order to lay a groundwork for the proper construction of the federal and municipal statutes involved in this case.

### B. *Equal Protection in Civil Cases.*

Over the past two decades one of the most important trends in both judicial and legislative decisions has been the enormous thrust to equalize the treatment of rich and poor in the courts. Spurred on by Supreme Court decisions dealing with the right to counsel, federal and privately sponsored legal service organizations have sprung up in increasing numbers, both to implement the Court's mandate in criminal cases and to extend effectively the protection of the legal system for the first time to large numbers of poor civil litigants.[20]

The constitutional mandate that all citizens be accorded the equal protection of the laws [21] has formed the basis of many of these Supreme Court opinions. The seminal case, of course, is Griffin v. Illinois.[22] There the Court stated the broad egalitarian principle encompassed by the equal protection

18. *See* Hardy v. United States, 375 U.S. 277, 288, 84 S.Ct. 424, 431, 11 L.Ed.2d 331 (1964) (Mr. Justice Goldberg, concurring) : "No responsible retained lawyer who represents a defendant at trial will rely exclusively on his memory (even as supplemented by trial notes) in composing a list of possible trial errors which delimit his appeal."

19. Tate v. United States, 123 U.S.App. D.C. 261, 271, 359 F.2d 245, 255 (1966).

20. *See generally* Note, Neighborhood Law Offices: The New Wave in Legal Services for the Poor, 80 Harv.L.Rev. 805 (1967).

21. While the equal protection clause of the Fourteenth Amendment does not by its terms apply to the federal government, since Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), there has been little doubt that "the concepts of equal protection and due process, both stemming from our American ideal of

fairness, are not mutually exclusive." *Id.* at 499, 74 S.Ct. at 694. This court has held that the equal protection guarantee applies to the federal government through the Fifth Amendment. Bolton v. Harris, 130 U.S.App.D.C. 1, 4 n. 3, 395 F.2d 642, 645 n. 3 (1968) ; Hamilton National Bank v. District of Columbia, 85 U.S. App.D.C. 109, 115, 176 F.2d 624, 630, *cert. denied*, 338 U.S. 891, 70 S.Ct. 241, 94 L.Ed. 547 (1949). *See* Coppedge v. United States, 369 U.S. 438, 446–447, 82 S.Ct. 917, 922, 8 L.Ed.2d 21 (1962) (liberal construction of federal *in forma pauperis* statute, 28 U.S.C. § 1915 (1964), "impelled by considerations beyond the corners of 28 U.S.C. § 1915 * * * that it is our duty to assure to the greatest degree possible * * * equal treatment for every litigant before the bar" [citing Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956)]).

22. 351 U.S. 12, 76 S.Ct. 585 (1956).

clause: "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has."[23]

In *Griffin* the Court vacated the denial by the Illinois Supreme Court of a petition for post-conviction relief because the state had not provided the indigent defendants with a free copy of the trial transcript, which was deemed necessary for an effective appeal. Although the state could be said to have treated all parties equally in one respect—it had a single scale of fees which it charged to all who ordered transcripts [24]—the Court noted that only the rich could afford transcripts on appeal. The Court held that the practical unavailability of transcripts to the poor on appeal which resulted from this uniform · fee scale amounted to a denial of equal protection to the indigent. As a result the Court required the state to act affirmatively to equalize the burdens of the adversary process by furnishing transcripts to those who could not afford to pay for them.[25]

This same constitutional requirement that the state act affirmatively to equalize the conditions of the adversary process for the poor also stands behind the landmark decision requiring the courts to provide counsel for indigent defendants at trial. In Gideon v. Wainwright the Court "recognize[d] that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him."[26]

Emerging case law makes it clear that provision of unaided counsel at trial cannot, of itself, erase the inequalities stemming from the defendant's poverty.[27] Additional funds are necessary to make the defendant's representation more nearly equal to that of the government. The state must, therefore, provide funds to pay for defense counsel's trips to investigate the case and interview key witnesses.[28] Expert witnesses may have to be provided to testify on behalf of the defendant at trial on crucial issues.[29]

This concept of equal protection is equally viable in appellate courts. *Griffin* itself involved procedures on appeal. Douglas v. California [30] relied heavily on the language and principles of *Griffin* in holding that the states must provide counsel for indigent defendants on appeal. A few years later the Court held that appointed counsel must act just as if he were a paid advocate in order to "assure penniless defendants the same rights and opportunities on appeal—as nearly as is practicable—as are enjoyed by those persons who are in a similar

23. *Id.* at 19, 76 S.Ct. at 591.

24. For a discussion of the various standards of equality, *see* Developments in the Law: Equal Protection, 82 Harv.L.Rev. 1065, 1160–1192 (1969).

25. *See* Michelman, Foreword: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7 (1969).

26. Gideon v. Wainwright, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963).

27. *See* Note, Right to Aid in Addition to Counsel for Indigent Criminal Defendants, 47 Minn.L.Rev. 1054 (1963).

28. United States v. Germany, M.D.Ala., 32 F.R.D. 343, 32 F.R.D. 421 (1963) (Johnson, J.). In the federal courts appointed counsel are now compensated pursuant to the provisions of the Criminal Justice Act, 18 U.S.C. § 3006A(d) (Supp. IV 1965–1968).

29. A state must provide either a psychiatrist or the funds to obtain one at the trial of an indigent criminal defendant who has previously been judged insane. Bush v. McCollum, N.D.Tex., 231 F.Supp. 560 (1964), affirmed, 5 Cir., 344 F.2d 672 (1965). *Cf.* In re Ketchel, 68 Cal. 2d 397, 66 Cal.Rptr. 881, 438 P.2d 625 (1968). If a United States District Judge finds that "investigative, expert, or other services [are] necessary to an adequate defense," and that the defendant cannot purchase such services, the United States will provide "reasonable compensation" for such services. 18 U.S.C. § 3006A(e) (1964).

30. 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

situation but who are able to afford the retention of private counsel."[31]

Other roadblocks to appellate review for the poor have also been held unconstitutional. Court rules which condition the bringing of a direct appeal[32] from or a collateral attack[33] on a conviction upon the payment of a filing fee, however small,[34] deny equal protection to the indigent.[35] Expenses which do not totally preclude review, but which block effective access[36] to the courts for the poor may deny equal protection.[37] If a state hears all paid appeals, it may not screen the *in forma pauperis* cases, furnishing transcripts only after a trial judge's determination that there are issues worth appealing.[38] Nor has the Court limited its transcript requirement to serious offenses. Last term the Court announced that a state could not deny a free transcript to a defendant who wanted to appeal a conviction of violating a municipal ordinance.[39] The Court also struck down a New Jersey statute requiring indigents who appealed criminal convictions, lost, and subsequently went to prison, to repay the cost of state-provided transcripts. As the Court said: "[I]t is now fundamental that, once [avenues of appellate review are] established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts."[40]

The limits of a state's duty affirmatively to equalize a defendant's ability to participate meaningfully in the judicial process are only now being sketched out in the cases. The picture is far from complete, but recent cases dealing with costs in divorce cases[41] and transcripts on appeal from proceedings involving determination of parental rights,[42] coupled with the expansive readings being given to *in forma pauperis* statutes,[43] all sug-

31. Anders v. California, 386 U.S. 738, 745, 87 S.Ct. 1396, 1400, 18 L.Ed.2d 493 (1967).

32. Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959).

33. Smith v. Bennett, 365 U.S. 708, 81 S. Ct. 895, 6 L.Ed.2d 39 (1961).

34. The *Smith* case, *supra* Note 33, involved $3 and $4 fees.

35. In Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963), the Court held that Indiana had denied equal protection to an indigent defendant by refusing to furnish him the trial transcript required to confer jurisdiction on the Indiana Supreme Court to hear his appeal from the trial court's denial of a writ of error *coram nobis*.

36. The Court in *Griffin* required the states to furnish transcripts because, as was conceded by the parties, *effective* appellate review would be impossible without a transcript of the trial.

37. Gardner v. California, 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (1969) (transcript of evidentiary hearing in *habeas corpus* proceeding, for use in *de novo* application to higher court) ; Roberts v. La Vallee, 389 U.S. 40, 88 S.Ct. 194, 19 L. Ed.2d 41 (1967) (transcript of preliminary hearing).

38. Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963) ; Eskridge v. Washington State Prison Board, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958).

39. Appellant had been sentenced to 90 days in jail for driving while drunk. Williams v. Oklahoma City, 395 U.S. 458, 89 S.Ct. 1818, 23 L.Ed.2d 440 (1969).

40. Rinaldi v. Yeager, 384 U.S. 305, 310, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577 (1966).

41. Harris v. Harris, 137 U.S.App.D.C. ——, 424 F.2d 806, (decided January 14, 1970) ; *see* Jeffreys v. Jeffreys, 58 Misc. 2d 1045, 296 N.Y.S.2d 74 (1968). The Supreme Court has heard oral argument in Boddie v. State of Connecticut, D. Conn., 286 F.Supp. 968 (1968), *probable jurisdiction noted*, 395 U.S. 974, 89 S.Ct. 2138, 23 L.Ed.2d 763 (1969) (requiring indigent plaintiffs seeking divorce to pay filing fees not violative of equal protection).

42. Chambers v. District Court of Dubuque County, Iowa, 152 N.W.2d 818 (1967) ; *see* In re Karren [Munkelwitz v. Hennepin County Welfare Dept.], Minn., 159 N.W.2d 402 (1968).

43. Coppedge v. United States, *supra* Note 21 ; Pasquarella v. Santos, 1 Cir., 416

gest that the trend seems to be toward more, not less, affirmative action. Thus, while most of the cases extending equal protection to the judicial process have involved criminal proceedings, the constitutional mandate that there be no invidious discrimination between indigent and rich litigants is being recognized in civil cases as well.

■ The equal protection clause applies to both civil and criminal cases; the Constitution protects life, liberty and property. It is the importance of the right to the individual, not the technical distinction between civil and criminal, which should be of importance to a court in deciding what procedures are constitutionally required in each case.[44] Often a poor litigant will have more at stake in a civil case than in a criminal case. "The struggling employee * * * may well find a wage attachment or confiscation of his tools as onerous in securing employment as a criminal conviction. Moreover, the citizen who permanently loses his home, a government job, a required license, or unemployment benefits may * * * receive a more crippling blow that the criminal who serves a jail sentence." [45]

The Supreme Court has not considered itself bound by formal distinctions. It has not hesitated to apply these notions of equal protection in some proceedings traditionally considered civil; the right to a free transcript extends to *coram nobis* [46] and *habeas corpus* [47] proceedings. Although these types of cases might fairly be characterized as criminal, they do show that the civil-criminal distinction is not the touchstone of equal protection.

In at least one overtly civil case the Court has applied an analysis similar to that used in *Griffin* and the filing fee cases in holding that a state may not condition the exercise of an important right on the payment of a fee. In Harper v. Virginia Board of Elections [48] the Court held that a state could not condition the right to vote on the payment of a uniform and relatively insignificant ($1.50) poll tax. The Court said:

"We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax. * * " [49]

■ The right of all to have free access to the courts is basic to our democratic system. It too cannot be conditioned on the payment of a fee where such a condition precludes the exercise of the right. Just as the poll tax bears no relation to voter qualification, a litigant's ability to pay for a transcript bears no relation to the justice of his position in a suit against him for eviction.

■ Civil cases, of course, are different from criminal cases in that the state is not always the moving party. But this difference does not establish that the underlying principle of *Griffin* is completely inapplicable to civil cases. None of the equal protection cases discussed above has focused on the state's direct involvement in the criminal proceeding. Instead, the Court focused on the deficiencies of procedures whereby

F.2d 436 (1969). *See also* Thompson v. Mazo, 137 U.S.App.D.C. 221, 421 F.2d 1156, (decided January 12, 1970).

44. *Cf.* In re Gault, 387 U.S. 1, 50, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967): To hold that the Fifth Amendment's safeguard against self-incrimination did not apply to juvenile court proceedings "would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings."

45. Note, The Right to Counsel in Civil Litigation, 66 Colum.L.Rev. 1322, 1333 (1966).

46. Lane v. Brown, *supra* Note 35.

47. Gardner v. California, *supra* Note 37.

48. 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed. 2d 169 (1966).

49. *Id.* at 666, 86 S.Ct. at 1081.

rich litigants received more thorough consideration of their appeals than did poor litigants. Court procedures which of themselves invidiously discriminate between rich and poor impair guarantees of equal justice which the Constitution was designed to protect. As Shelley v. Kraemer [50] teaches, the courts themselves may not be vehicles of discrimination. There the Court barred judicial enforcement of discriminatory private agreements, in spite of the fact that these agreements were legal between the parties.[51] In the instant case the DCCA held that its own rules mean that appellant was unable to obtain the transcript even though this was necessary for determination by the court of the merits of a substantial question raised by appellant, whereas a rich litigant could have obtained such review simply by ordering the transcript.

While a government may have some affirmative obligations to aid poor litigants in civil cases, it is unnecessary that we determine the extent to which the Constitution requires it to end all distinctions between rich and poor in the courts, or to provide indigent civil litigants with transcripts on appeal. Moreover, despite the compelling arguments which can be marshalled to show that transcripts are constitutionally required for civil appeals presenting substantial issues, our holding today is not such a ruling. Instead, mindful of our obligation to avoid reaching the constitutional issues whenever possible,[52] we proceed to consider the applicable federal and District of Columbia statutes, impelled— if not compelled—to equalize the opportunities of rich and poor to obtain appellate review.

## C. *The Statutes.*

The basic statute governing the Court of General Sessions reporters is 11 D.C. Code § 935 (1967). It provides:

"In addition to their annual salaries, *official reporters* for the District of Columbia Court of General Sessions *may charge and collect from parties,* including the United States and the District of Columbia, who request transcripts of the original records of proceedings, *only such fees as may be prescribed from time to time by the court.* The official reporters shall furnish all supplies at their own expense. *The court shall prescribe such rules, practice, and procedure pertaining to fees for transcripts as it deems necessary, conforming as nearly as practicable to the rules, practice, and procedure established for the United States District Court for the District of Columbia.* A fee may not be charged or taxed for a copy of a transcript delivered to a judge at his request or for copies of a transcript delivered to the clerk of the court for the records of the court. Except as to transcripts that are to be paid for by the United States or the District of Columbia, the reporters may require a party requesting a transcript to prepay the estimated fee therefor in advance of delivery of the transcript."

(Emphasis added.)

Appellant has argued forcefully that the statute would allow the Court of General Sessions to establish a new fee schedule under which court reporters could charge for transcripts only for non-indigent litigants. Appellant further argues that such a schedule should be established in order to avoid possible constitutional difficulties. While we

---

50. 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

51. *See* Hurd v. Hodge, 344 U.S. 24, 28–29, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). Today, of course, such agreements are illegal. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). *See also* Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969).

52. *E. g.,* International Ass'n of Machinists v. Street, 367 U.S. 740, 749, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

agree that the Court of General Sessions may have statutory authority to establish such a fee schedule, for reasons already stated we hesitate to hold that General Sessions has a constitutional obligation to do so.

Reading Section 935 as authorizing the proposed fee schedule also presents problems. In the absence of further congressional enactment, such a fee schedule would put the burden of providing transcripts for indigent civil litigants exclusively on the court reporters. Appellant counters this objection by arguing that court reporters are officers of the court, citing Oswald v. United States, 9 Cir., 96 F.2d 10 (1938), and that a court may ask its officers to perform their official duties without fee, just as attorneys are often asked to represent indigent defendants without charge. Moreover, the reporters do receive salaries from the District, and appellant suggests that these salaries were designed to compensate them for all official duties which do not otherwise result in fees. Providing transcripts for the indigent might be one of those otherwise uncompensated official duties.

The difficulty with this argument is that the reporters must bear all of their own expenses. They must provide all their own equipment and supplies and contract for any needed secretarial help. There is no indication in the statute that these expenses are intended to be paid out of the reporters' salaries. Presumably these expenses are to be paid out of the transcript fees they collect. Therefore, we shy away from requiring such a broad revision of the court fees without further knowledge of the costs of transcribing and the likely number of *in forma pauperis* appeals which would be generated by such a holding.

We find appellant's argument based on the interrelation of 11 D.C.Code § 935 and 28 U.S.C. § 753 (1964 and Supp. IV 1965–1968) more persuasive. Section 935 imposes a duty on the court to equate the "rules, practice, and procedure" relating to fees for transcripts in the Court of General Sessions as nearly as practicable to those in the United States District Court for the District of Columbia. Section 753 determines the litigant's eligibility for a free transcript in the District Court. It requires the United States to pay transcript costs for civil litigants under certain circumstances: "Fees for transcripts furnished in [civil] proceedings to persons permitted to appeal in forma pauperis shall also be paid by the United States if the trial judge or a circuit judge certifies that the appeal is not frivolous (but presents a substantial question)." [53]

We have already considered the interrelationship between these two statutes in some detail in Tate v. United States.[54] In *Tate* we held that these same statutes require the United States to pay for transcripts for indigents in criminal cases appealed from the Court of General Sessions. The court explained its holding:[55]

" * * * Although [28 U.S.C. § 753(f)] does not apply in and of itself, and in all its terms, to the Court of General Sessions, this fee provision in subsection (f) is made applicable to the Court of General Sessions reporters by virtue of the mandate of D.C. Code § 11–935. It may be that the immediate purpose of § 11–935 when passed in 1947 was to equalize compensation of reporters in the then Municipal Court with that of reporters in the District Court. However, it is plainly no bar to interpretation of a statute as applicable that 'the question raised

53. 28 U.S.C. § 753(f) (Supp. IV 1965–1968). Authority to proceed *in forma pauperis* is granted pursuant to 28 U.S.C. § 1915 (1964). The *in forma pauperis* provision for the Court of General Sessions is 15 D.C.Code § 712 (1967). *See* DCCA Rule 43.

54. *Supra* Note 19.

55. 123 U.S.App.D.C. at 270, 359 F.2d at 254.

was not considered by the legislature,' at least where the construction flows naturally from the statutory language. These considerations are all the more compelling in a case like that under discussion, where a contrary construction would force us to face constitutional questions of a serious nature * * *. * * *

"This construction of D.C.Code § 11–935 comports with the general objective of Congress that the procedures and rights of parties in the Court of General Sessions parallel those in the District Court as closely as practicable. D.C.Code § 13–101 (Supp. V, 1966). * * *"

(Footnotes omitted.)

We find the statutory interpretation of *Tate* to be applicable here. As in *Tate*, we find that construing these two statutes to provide a right to a free transcript on appeal from the Court of General Sessions in a congressionally limited class of civil cases "comports with the general objective of Congress that the procedures and rights of parties in the Court of General Sessions parallel those in the District Court as closely as practicable." [56]

Although not necessary for our disposition here, an additional factor compels the result in this case. A landlord seeking to oust a tenant who is delinquent in his rent payments has a choice of remedies. He can either sue in the District Court seeking the traditional remedy of ejectment, or he can do as Habib did here: sue in the Court of General Sessions seeking the summary remedy of possession.[57] If the landlord had sued in the District Court, Lee would have been able to apply for a free transcript.[58] We question whether Congress could constitutionally deprive him of that right because his landlord chose to proceed against him in the Court of General Sessions. Our construction of the applicable statutes precludes any necessity to explore further this possible difference in treatment of litigants.

V

We hold today only that the United States must pay for transcripts for indigent litigants allowed to appeal *in forma pauperis* to the District of Columbia Court of Appeals if the trial judge or a judge of the DCCA certifies that the appeal raises a substantial question the resolution of which requires a transcript. We do not hold that every civil case will require a transcript on appeal.[59] We indicate no opinion as to whether one will be necessary in this case.

We realize that in many cases it will be difficult for the court and the litigants to discern whether substantial questions really are presented unless the complete record is available

56. *Ibid.* Construing § 753 to require the United States to pay for transcripts also comports with the intent of Congress as expressed in the Senate and House Reports. Those Reports state that an important purpose of § 935 was to "equalize the compensation of the official shorthand reporters" in General Sessions with the compensation received by the District Court reporters. H.R.Rep.No.894, 80th Cong., 1st Sess. (1947); S.Rep.No.381, 80th Cong., 1st Sess. (1947). Congress has thus indicated that the District of Columbia court reporters should not have to provide without charge transcripts for which the District Court reporters could have charged their regular fees. A possible alternative, as we have indicated above, to the statutory interpretation in this case is a requirement that the court reporters themselves bear the cost of producing these needed transcripts. Reading § 753 in accordance with its plain words avoids a result contrary to the stated purpose of 11 D.C.Code § 935.

57. *See* 45 D.C.Code § 910.

58. 28 U.S.C. §§ 753(f), 1915.

59. Nor do we hold that the government must furnish complete transcripts after such certification. *Cf.* Hardy v. United States, *supra* Note 18.

To allow free transcripts for all civil litigants would only serve to foment unnecessary appellate litigation. Civil litigants appealing with their own funds have to weigh their probability of success on appeal and the value to them of a victory against the possible costs of an appeal. *See* Note, The Indigent's Right to Counsel in Civil Cases, 76 Yale L.J. 545, 560 (1967).

for their inspection. Judge Learned Hand noted the dilemma: "We are of course aware that a thorough decision whether there was a substantial question would depend upon a scrutiny of the whole record; so that, speaking literally, we could not adequately decide the motion until after we had granted it." [60] We do expect, however, that judges will be careful to avoid this dilemma in ruling on these motions for transcripts. Doubts about substantiality of the questions on appeal and the need for a transcript to explore them should be resolved in favor of the petitioner.[61] In like manner we expect that the judges will give due consideration to motions for transcripts in cases where the law appears to be settled, but where the appellant is able to show that his chances of changing the law on appeal are strong.

We therefore reverse the judgments of the DCCA and remand for a determination of the substantiality of the questions raised by this appeal, and for a consideration of the need of appellant for a transcript in order to present these questions to the court.

Reversed and remanded.

---

60. Jaffe v. United States, 2 Cir., 246 F.2d 760, 762 (1957).

61. *See* Ortiz v. Greyhound Corp., D.Md., 192 F.Supp. 903, 906 (1959), affirmed, 4 Cir., 275 F.2d 770 (1960).