**James SMITH et al.**

v.

**Officer Barry LEES et al.**

**Civ. A. No. 74–2695.**

United States District Court,
E. D. Pennsylvania.

March 28, 1977.

Frank Weitzman, Philadelphia, Pa., for plaintiffs.

Stephen T. Saltz, Deputy City Solicitor, Philadelphia, Pa., for defendants.

OPINION

DITTER, District Judge.

This is a civil rights action in which damages were sought from a police officer, the police commissioner, and the City of Philadelphia. Presently before the court is the plaintiffs' motion to proceed with an appeal in forma pauperis. For the reasons that follow the motion will be denied.

The plaintiffs are three residents of the City, John Smith, Earline Dollard, the woman with whom he lives, and her son, John Dollard. Barry Lees is the officer who was actually involved in the incident giving rise to the suit, while the claim against Police Commissioner Joseph F. O'Neill and the City was predicated on the allegation that they knew or should have known of Lee's propensities to engage in violent and unconstitutional conduct but took no remedial action. During the trial I granted the City's motion to dismiss and directed a verdict in favor of O'Neill as against plaintiff Earline Dollard. Thereafter, in response to interrogatories the jury returned a verdict in favor of James Smith against Lees for $32,500. in compensatory damages; found

in favor of Lees as against the other two plaintiffs, Earline Dollard and John Dollard; and found in favor of. O'Neill as against Smith and John Dollard. Believing that the City should not have been dismissed nor a directed verdict entered for O'Neill against Earline Dollard, that the verdict in favor of Smith as against Lees was insufficient, and that the remaining verdicts were against the weight of the evidence, plaintiffs, without having filed post-trial motions, took a direct appeal to the Court of Appeals for the Third Circuit.

The facts giving rise to this suit were sharply disputed by the parties. The incident in question occurred at about 10:00 o'clock on the evening of October 30, 1973. According to the defendants, Officer Lees and his partner were on sector patrol when they received a call that a bar operated by Pedro Borgus had been robbed. Responding to the call, they were met in front of the bar by Borgus who pointed to two men running from the scene and stated that they had just stolen his cash register. Lees pursued the one whom he later identified as John Dollard through several abandoned row houses. With Lees close behind, Dollard then ran into his own house, closed and locked the door. Lees knocked on the door and was admitted by Earline Dollard. He told Mrs. Dollard that he was looking for someone who had just stolen a cash register. There were approximately nine people in the house at this time. Lees observed John Dollard standing at the top of the stairs leading to the second floor of the house and started up after him. Smith met Lees at the foot of the stairs and after a brief, but heated discussion as to whether Lees needed a search warrant, Smith began to hit Lees. The officer responded by striking Smith once on the head with a blackjack, knocking him to the floor. At this point, Earline Dollard jumped on Lees back and began hitting him. Other officers arrived and Earline Dollard and Smith were arrested. Lees proceeded up the stairs, found John Dollard hiding in a bedroom, and arrested him.[1]

1. Although a named-plaintiff, John Dollard was not called as a witness to deny his part in the robbery of the Borgus bar or to testify as to any of the events which preceded his arrest.

Under plaintiffs' version of the facts, Earline Dollard was upstairs when she heard someone knocking on the front door. Upon going to the window, she saw that a policeman was there. She went downstairs and was about to open the door when Lees broke the lock, causing the door to fly open and to hit her on the shoulder. Without giving any explanation, Lees went directly to the kitchen and looked around. He then drew his gun and started up the stairs to the second floor. As Lees approached the top of the staircase Smith came from the bedroom to the top of the stairs and asked what was wrong. Lees threw Smith down the stairs and then proceeded to search both bedrooms. He then came back downstairs, and when Smith protested that he (Smith) had done nothing wrong and attempted to go back upstairs, Lees pushed him down the stairs again, threw him against the wall, and began to beat him about the arms and shoulder with his fists and blackjack. Shortly after other officers arrived and Smith had been placed in handcuffs, Lees again beat Smith with the blackjack, this time hitting him on the head. John Dollard arrived on the scene at about this time and grabbed Lees arm to prevent the latter from continuing to beat Smith. Eventually both John Dollard and Smith were arrested and Smith was taken to the hospital.[2]

The answers to special interrogatories submitted to the jury show its substantial acceptance of defendants' factual contentions. Specifically, the jury concluded that:

1. Lees observed two men running away from the bar operated by Pedro Borgus at 3rd and Diamond Street.

2. Borgus told Lees these two men had stolen his cash register.

3. Lees honestly and reasonably believed that one or both of these two men had stolen Borgus' cash register.

4. Lees pursued these two men.

5. One of these men was John Dollard.

6. When Lees entered the home of Earline Dollard he had an honest and reasonable belief that John Dollard had stolen Borgus' cash register and that John Dollard had entered the home of Earline Dollard.

7. Lees did not negligently open the door to Earline Dollard's house.

8. Lees did not deprive Earline Dollard of a right guaranteed to her under the constitution by entering her dwelling or by the manner in which he searched it.

Although finding in favor of Smith, i. e., that

7. Barry Lees deprived James Smith of a right guaranteed to him under the Constitution by using excessive force upon Smith, and

8. Lees' use of excessive force was the proximate cause of Smith's damages,

the jury refused an award of punitive damages, thus indicating its further rejection of the plaintiffs' factual contentions.

Leave to proceed on appeal in forma pauperis and to have the trial transcript prepared at government expense is governed by 28 U.S.C. §§ 1915 and 753(f) and Rule 24 of the Federal Rules of Appellate Procedure. Under these provisions an in forma pauperis application must be accompanied by an affidavit showing the petitioner's inability to pay fees and costs or give security therefore, his belief that he is entitled to redress, and a statement of the issues which he tends to raise on appeal. When the required affidavit has been filed the court should grant the motion unless it appears that the appeal is frivolous or not taken in good faith or that the allegations of poverty are untrue. See 28 U.S.C. § 1915(a), (d).

■ The appellants have filed the required affidavits. Each states the belief that the respective plaintiff is entitled to redress and contains a sufficient showing of poverty to satisfy the liberal standards of

2. Much of the testimony offered in support of plaintiffs' claims was that of Earline Dollard, and she was severely impeached by defense counsel on the basis of prior inconsistent statements made in the complaint and in answers to interrogatories.

*Adkins v. E. I. DuPont de Nemours & Co.,* 335 U.S. 331, 69 S.Ct. 85, 93 L.Ed. 43 (1948).[3] See also *Souder v. McGuire,* 516 F.2d 820, 823–24 (3d Cir. 1975). The only question which requires further discussion concerns the substantiality of the issues which plaintiffs seek to raise on appeal. In considering this question I am mindful of the admonition that the "threshold level [of good faith] for permitting persons to proceed in forma pauperis is not very great," *Miranda v. United States,* 458 F.2d 1179, 1181 (2d Cir.) cert. denied, 409 U.S. 874, 93 S.Ct. 207, 34 L.Ed.2d 126 (1972) and that

> Doubts about substantiality of the questions on appeal and the need for a transcript to explore them should be resolved in favor of the petitioner. (footnote omitted). In like manner we expect that the judges will give due consideration to motions for transcripts in cases where the law appears to be settled, but where the appellant is able to show that his chances of changing the law on appeal are strong.

*Lee v. Habib,* 137 U.S.App.D.C. 403, 424 F.2d 891, 905 (1970). As noted previously, the issues which plaintiffs seek to raise on appeal are that: (1) I erred in dismissing the complaint against the City of Philadelphia; (2) I erred in not submitting Earline Dollard's claim against O'Neill to the jury; (3) the verdict in favor of Smith and against Lees was insufficient; and (4) the verdicts in favor of Lees against the Dollards and in favor of O'Neill against Smith and John Dollard was against the weight of the evidence.

Treating the last issue first, I have no trouble in concluding that plaintiffs' claim that the verdict was against the weight of the evidence is totally frivolous. When the evidence is in dispute it is singularly within the province of the jury to decide which version of the facts is to be accepted. As the recital of the evidence given indicates, the jury's findings on the question of Lee's liability to each plaintiff were more than amply supported by the testimony and exhibits presented at trial. Plaintiffs' claim to the contrary is totally lacking in merit.

The same conclusion applies to the jury's finding that O'Neill was not liable. Plaintiffs' only evidence with respect to O'Neill's liability consisted of the testimony of Edwin Moore, an attorney and neighbor of Lees. Moore had been involved in a running dispute with Lees for a considerable period of time. Their difficulties centered around Moore's opposition to Lees

---

**3.** My court reporter has advised me that the cost of transcribing the notes of testimony of the trial will be approximately $2500. Because plaintiff Smith has not yet collected his $32,500. judgment I have no difficulty in concluding that he presently meets the poverty requirements necessary to appeal in forma pauperis. However, whether Smith would be liable to reimburse the United States for the cost of the transcript if I were to allow him to appeal in forma pauperis would, I believe, depend on the outcome of his appeal. At oral argument on the instant motion I questioned plaintiffs' counsel on this issue. Counsel took the position that whether or not plaintiffs prevailed on appeal they should not be required to reimburse the United States for the cost of transcribing the notes of testimony. I agree that if plaintiffs prevail on appeal and are awarded a new trial they should not be liable to reimburse the United States for the cost of preparing the transcript. (In this situation Fed.Rule App.Proc. 39(a) and (e) and 28 U.S.C. § 1915(e) (second sentence) would allow the United States to recover the cost of the transcript from the defendants.) However, if the plaintiffs do not

prevail on appeal and are not awarded a new trial, Smith then would be entitled to collect his $32,500. verdict and would no longer be a pauper. At that point I see no reason why the government should not be able to recover the cost of preparing the transcript from Smith's judgment. But, cf. *Evans v. Tennessee Department of Corrections,* 514 F.2d 283 (6th Cir. 1975) (per curiam). I do not believe that allowing the government recoupment of its expenditure in such a situation would unfairly burden an indigent's right of access to the appellate courts. Cf. *Fuller v. Oregon,* 417 U.S. 40, 52–54, 94 S.Ct. 2116, 2123–25, 40 L.Ed.2d 642 (1974).

Since the Dollards also are appellants in this case and are without assets, if the Court of Appeals did not order a new trial, it might be necessary to apportion the cost of the transcript among the three appellants, with Smith reimbursing the United States only for his proportionate share. See *Adkins,* supra, 335 U.S. at 340, 69 S.Ct. at 89; *Martin v. Gulf States Utilities Co.,* 221 F.Supp. 757, 760 (W.D.La. 1963).

keeping horses on his property. According to Moore, on June 7, 1971, while Moore was placing trash cans at the front of his own property, Lees came up to him and started a fist fight during the course of which Lees got Moore on the ground and repeatedly punched him in the face, knocking out a tooth and causing other injuries. As a result of this altercation police were called to the scene and Moore was arrested. Plaintiffs' theory was that this incident should have put O'Neill on notice that Lees was unfit to be a police officer.

The defendants showed that immediately after the altercation, other police officers conducted a thorough investigation which included interviews with neighbors and a physical examination of the area. The search revealed blood stains and Moore's tooth, both of which were located on Lees' property. This tended to refute Moore's claim as to where the fight had taken place and supported Lees' contention that it was Moore who had attacked Lees while the latter was on his own property and that Lees had merely defended himself. Lees' version also was supported by the statement of his father, Carl Lees, the only eyewitness to this incident. Upon completion of their investigation, the officers submitted a report in which they concluded that Lees had acted in self-defense and recommended that no disciplinary action be taken against him.

■ There were several glaring weaknesses in plaintiffs' proof against O'Neill, the most obvious being the failure to produce any evidence that O'Neill was aware of the Moore incident or how or why in a police department of some 8,000 members he should have been aware of it.[4] Moreover, even if the jury might have inferred that O'Neill at least should have known of this fracas, the plaintiffs failed to show upon what basis O'Neill should have declined to accept the recommendation of the investigating officers that no disciplinary action be taken against Lees. Based on the evidence presented it was not at all surprising that the jury found O'Neill had not been at fault in failing to take action against Lees as a result of the Moore incident.

■ On the issue of O'Neill's liability plaintiffs also offered to prove that Lees had lied on his application to become a policeman. It was plaintiffs' theory that the police department should have discovered the falsehood and based thereon, should have concluded that Lees was unfit to be a police officer. In this regard, plaintiffs' counsel sought to cross-examine Lees about alleged inconsistencies between his employment application and records from his prior military service. The police department application asked, *inter alia*, two questions: (1) "Have you ever received a discharge other than honorable from the Armed Forces of the United States?"; (2) "Have you ever had any mental illness or nervous disease or epilepsy, or been a patient in an institution for treatment of such illness or disease, or been a patient of a psychiatrist?" Lees answered "no" to both. I refused to allow the attempted cross-examination for two reasons. First, the military records simply were not inconsistent with the answers Lees gave on the police application. Lees received a "General Discharge Under Honorable Conditions", which although it is not the same as an "Honorable Discharge" might reasonably be interpreted as not being "other than honorable." There are three kinds of administrative discharges: Honorable, General, and Undesirable. Only the latter is specified to be a "Discharge under Other than Honorable Conditions."[5] See 32 C.F.R. § 41.9. However, even if

---

4. Since respondeat superior does not apply to civil rights cases it would not be sufficient to establish O'Neill's liability for plaintiffs merely to prove that Lees immediate supervisor or some other officials in the chain of command knew or should have known of the Moore incident. The report of the officers who investigated the Moore incident contained O'Neill's initials, apparently indicating his review of the document. However, plaintiffs' counsel never brought this fact to the attention of the jury.

5. Following the undesirable Discharge in declining order of desirability are the Bad Conduct Discharge and the Dishonorable Discharge which can be issued only after a court-martial.

Lees' negative response to this question be deemed inappropriate, it was cured by three subsequent answers which stated his was a "General Discharge Under Honorable Conditions." See plaintiffs' exhibit I–17 at pp. 3, 5, and 7. As to the mental illness question, Lees' service records showed he had undergone a psychiatric examination and had been diagnosed as having an "emotional instability reaction, chronic, moderate . . ." However, the report went on to state that Lees was "free of mental defect, disease or derangement . . ." Obviously Lees had not been diagnosed as having a "mental illness or nervous disease or epilepsy." The fact that he had had a psychiatric evaluation did not mean that he had been "a patient of a psychiatrist."

My second reason for refusing to allow Lees to be cross-examined about his service record was that plaintiff proffered no theory, must less any evidence, to show that O'Neill (as opposed to some unknown individual in the police personnel department) knew or should have known the details of Lees' police department application.

■ Turning to the claims against the City, I dismissed it as a defendant for the reasons stated in *Pitrone v. Mercadante*, 420 F.Supp. 1384 (E.D.Pa.1976), namely that there can be no implied cause of action against a municipality directly under the Fourteenth Amendment.[6] If the issue on appeal were merely the propriety of this ruling, I would have no trouble finding the required substantiality. Indeed in the *Pitrone* case I specifically noted the conflict within this court on the Fourteenth Amendment cause of action question and made the necessary certification under Fed.R. Civ. Proc. 54(b) to allow an immediate appeal.[7] Unfortunately the situation here is more complicated. Smith has recovered a judgment against Lees and at oral argument on

the instant motion, I was told by the assistant city solicitor that it would pay this judgment. Here the jury's verdict amounted to an assessment of Smith's total damages stemming from the incident in question. Any finding of liability against either O'Neill or the City would not expand the scope of these damages. Since the City has agreed to pay Smith the total amount which the jury said he is entitled to receive for his injuries, it is difficult to see how Smith is adversely affected by the dismissal of the City. Even if Smith technically has standing to appeal this issue, see generally *C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure* § 3902 (1976), I do not believe the United States should be required to foot the bill so that plaintiff may obtain an appellate decision on a nice point of law that will have no practical consequences. Plaintiffs' answer that dismissal of the City does have practical consequences.

Smith argues that dismissal of the City, particularly during the course of trial and after the jury knew it had once been a defendant, resulted in a lower verdict. His theory is that the jury might have returned a higher verdict if the City had been left in the case because it would have realized that the City is better able to pay substantial damages than is an individual such as Lees.[8] Not only is this theory wholly speculative in itself but other parts of the jury's verdict render it totally frivolous. It must be remembered that the doctrine of respondeat superior has no application in a Section 1983 suit and that liability must be predicated on affirmative personal culpability. See *Rizzo v. Goode*, 423 U.S. 362, 370, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976); *Bracey v. Grenoble*, 494 F.2d 566, 571 (3d Cir. 1974). The jury found no such culpability on the part

---

6. The complaint in this case did not specifically assert jurisdiction under 28 U.S.C. § 1331. Nonetheless, rather than dismissing on this technical ground, I considered the availability of Section 1331 jurisdiction since if it would have aided plaintiffs' case against the City, I would have allowed them to amend their complaint to add it as a basis of jurisdiction.

7. An appeal was in fact taken in *Pitrone* and is presently pending before the Third Circuit.

8. With respect to the Dollards, the theory presumably is that the City's "deep pockets" would have motivated the jury to find in their favor and award at least some damages. For the reasons stated in the text, I find this theory equally frivolous.

of Commissioner O'Neill and, as previously stated, its verdict in that regard was amply supported by the evidence. There is no possible basis in this case on which the City's liability could have turned other than on the culpability of its high ranking official, Police Commissioner O'Neill. Thus, in view of the verdict in favor of O'Neill it is inconceivable that the jury would have found the City liable *at all* much less have awarded greater damages, even if the City had remained in the case as a defendant.

What has just been said also disposes of the claim that Earline Dollard was adversely affected by my not letting her claim against O'Neill go to the jury. Once again, it is inconceivable that on the evidence presented the jury would have returned a verdict in her favor while at the same time finding in favor of O'Neill as against Smith and John Dollard.[9]

The remaining issue which plaintiff Smith seeks to raise on appeal is that the verdict of $32,500. against Lees is inadequate. Given the evidence presented on the damage issue and the narrow scope of an appellate court's authority to set aside a jury verdict on grounds of inadequacy, I conclude that this issue too is frivolous.

*Tann v. Service Distributors, Inc.*, 56 F.R.D. 593, 598 (E.D.Pa.1972), aff'd mem., 481 F.2d 1399 (3d Cir. 1973), explains the governing principles in this area quite succinctly:

> Damages assessed by a jury are not to be set aside unless shocking to the judicial conscience or so grossly inadequate as to constitute a miscarriage of justice, *Coleman v. Quaker State Coca-Cola Bottling Co.*, 328 F.Supp. 314 (E.D.Pa.1971); *Peterson v. Calmar Steamship Corp.*, 296 F.Supp. 8 (E.D.Pa.1969), or unless the jury's award indicates caprice or mistake

or a clear abuse of its fact-finding discretion or the clear influence of partiality, corruption, passion, prejudice, or a misconception of the law, *Mainelli v. Haberstroh*, 237 F.Supp. 190 (M.D.Pa.1964), aff'd per curiam, 344 F.2d 965 (3d Cir. 1965). The trial judge should be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff.

Appellate review of damage awards for inadequacy is even narrower than the standard set forth above; generally it is limited to ascertaining whether the trial court's refusal to order a new trial on this ground amounts to an abuse of discretion. See, e. g., *Pellegrin v. J. Ray McDermott and Co., Inc.*, 504 F.2d 884, 885 (5th Cir. 1974) (per curiam).

The primary injury suffered by Smith was a depressed skull fracture resulting from the blackjack blow inflicted by Lees. Plaintiff sought to prove through the testimony of his medical experts that the blow to the head had caused permanent brain damage which disabled Smith, who was only 39 years of age at the time of the incident, from engaging in any substantial gainful employment for the rest of his life. If this had been the only evidence *and* if the jury had believed it,[10] the $32,500. would, indeed, have been an extremely low damage award. However this was not the case.

The defendants did not seriously dispute that Smith had some intellectual inadequacy, but contended that that condition did not result from the blow inflicted by Lees. To prove this the defendants introduced evidence showing that, following a fairly short period of treatment and convalescence immediately after the incident,

9. The reason I directed a verdict in favor of O'Neill as against Earline Dollard, but allowed John Dollard's and Smith's claims against O'Neill go to the jury is that unlike the other two, Earline Dollard did not claim that Lees used excessive force against her. Rather, her claim was that Lees unlawfully entered and searched her home in the process of which he broke open the door, causing it to hit her in the

shoulder. There was absolutely no evidence to show that O'Neill knew or should have known Lees would engage in such conduct.

10. The jury, of course, may reject even uncontradicted testimony. See, e. g., *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627–28, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944).

Smith returned to his job and worked for well over a year. This evidence also showed that the reason for Smith's employment termination was not his head injury, but because, after repeated warnings, he was intoxicated while at work. In addition, defendants' expert, Dr. Lord Lee-Benner, testified that medical records made prior to the incident in question showed that Smith had had an IQ of 80 and had just barely been able to function normally even before he suffered the fractured skull. Dr. Lee-Benner also stated that it was impossible to determine whether Smith had suffered brain damage from the skull fracture or whether it was caused by some other factor, such as a birth defect; that heavy drinking could account for Smith's intellectual inadequacies; and that in his opinion Smith was malingering and was capable of returning to gainful employment.

The jury was certainly entitled to accept or reject such testimony as it saw fit and on the basis of all the evidence presented on the damage issue, it can hardly be said that the jury's verdict of $32,500. is so inadequate as to "shock the conscience."

For all of the reasons stated above I conclude that plaintiff's appeal is frivolous and the motion to proceed on appeal in forma pauperis therefore is denied.