**Romie VETTERS, Jr., Plaintiff-Appellee,**

v.

**James BERRY and Al Phifer, Defendants-Appellants.**

No. 76–1920.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 1, 1977.

Decided April 14, 1978.

Allen W. Wallace, Waverly, Tenn., for Berry.

John Lee Williams, Porch, Peeler & Williams, Waverly, Tenn., for Phifer.

Thomas A. Higgins, Nashville, Tenn., for Phifer and Berry.

Claude Callicott, Callicott, Marshall, Havron & McBroom, Nashville, Tenn., Mark H. Collier, Waverly, Tenn., for plaintiff-appellee.

Before PECK, Circuit Judge, MERRITT, Circuit Judge and THORNTON, Senior District Judge.*

THORNTON, Senior District Judge.

This is an appeal by the defendants, James Berry and Al Phifer, from a judgment entered in favor of the appellee, Romie Vetters, Jr., allowing recovery under a 42 U.S.C. § 1983 allegation that Berry and Phifer had deprived Vetters of his civil rights.

Suit was filed against Sheriff Bell, Chief Deputy Sheriff Henry, Deputy Sheriff Berry, police officer Phifer and the Fireman's

Fund Insurance Company. The suit was compromised, settled and dismissed as to Henry and was dismissed with prejudice as to Bell and the Fireman's Fund Insurance Company.

Vetters contended that he and other citizens were peacefully assembled in the Town of McEwen, Tennessee on Halloween night 1973; that Sheriff Bell commanded him and other citizens to get off the streets and go home; that he had committed no offense, was behaving himself and had a right to be where he was; that Sheriff Bell and others maliciously assaulted and beat him, unlawfully searched him, unlawfully arrested him and wrongfully held him in custody and took him to the courtroom where he was unlawfully charged with the offense of disorderly conduct and resisting arrest; that if the arrest was lawful it was accompanied by the use of excessive force; that he was brutally beaten and injured, was rendered totally disabled for a period of time and was partially disabled for a subsequent period of time; that he had suffered loss of income and impairment of earning power.

After a three-day trial the jury found in favor of the plaintiff against both Berry and Phifer, assessing compensatory damages of $520 against both Berry and Phifer, and awarding punitive damages in the amount of $25,000 against Berry and $10,-000 against Phifer.

Appellants present the following issues for determination by this Court:

(1) Whether the jury verdicts finding defendants violated the plaintiff's civil rights are supported by substantial evidence on the record as a whole.

(2) Whether the jury verdicts against defendants awarding compensatory and punitive damages are supported by substantial evidence on the record as a whole.

Appellants conjecture that the jury's determination that plaintiff should recover had to be based on the following erroneous factual findings and contend that said determination is unsupported by substantial evidence:

---

* The Honorable Thomas P. Thornton, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

(1) That Berry did something more than enter an ongoing fray with the intent of stopping it.

(2) That Phifer did more than simply pat down the plaintiff.

(3) That Phifer was responsible for the injuries sustained by the plaintiff at the hands of Sheriff Bell and Chief Deputy Henry prior to the pat down at Trooper Durham's patrol car.

At a conference between the Court and trial counsel prior to instructing the jury, Mr. John Williams, attorney for Phifer, advised the Court as follows:

So, I think there is a jury issue of whether he was kicked or whether he wasn't kicked, even beyond whether he should have been or whether he should not have been.

Reinforcing the above is the following statement by Williams:

Your Honor, I have no motion for a directed verdict because I don't think I am entitled to one.

At the same conference Mr. Allen Wallace, trial attorney for Berry, made the following comments:

If the Court please. To start with, the proof of the fist in the eye, first, he says he did, and Mr. Berry says he didn't. Of course, that makes it a jury question.

As to the knee in the stomach, Mr. Berry—the Sheriff had ordered Mr. Vetters arrested, and that's what Mr. Berry heard.

In the process of trying to make that arrest, he saw the resistance at another officer, and that, therefore he had a right to use the necessary force at that time to put the man under arrest.

We think that is a jury question as to whether or not that force was necessary. Mr. Vetters was fighting, according to Trooper Durham, Mr. Vetters was fighting at that time, fighting the officers he said.

There was an offense committed in his presence from Mr. Vetters. That's a jury question.

In the December 1973 term of the Circuit Court for Humphries County, Tennessee, grand jurors returned a two-count indictment. The first count charged Vetters with disturbing the peace of others by violent, profane, indecent, offensive and boisterous conduct. The second count charged Vetters with unlawfully obstructing justice and resisting peace officers in the performance of their official duties by refusing to obey the lawful commands of the peace officers to disburse and clear the streets. This indictment was received into evidence as Exhibit 3. The Order of Dismissal of this indictment was received into evidence as Exhibit 4. The latter recites in part that subpoenas had been issued by the state and the defendant calling for the testimony of witnesses for both sides of the litigation. However, the subpoenas had never been served and, as a result, no witnesses appeared for the trial of the case. The Court therefore entered an order of dismissal and discharged the defendant. It would seem that the conduct of the charging party in this prosecution, the sheriff and his men, in failing to continue the prosecution of the defendant Vetters would give the jury a basis for concluding that the officers did not have probable cause to make this arrest and that they had involved themselves in an illegal arrest of Vetters. This in and of itself constitutes a rather substantial piece of evidence.

In addition to the testimony of the plaintiff as to the character of his arrest which, if believed by the jury, would support a verdict of liability, there was other testimony of substance presented to the jury. From the testimony of the plaintiff:

Q. Was this the first time you had gone to the ground, Mr. Vetters?

A. Yes, sir.

Q. All right, then after you went to the ground, what happened and did anyone strike you further?

A. I was lying on my right-hand side. Phifer kicked me in my ribcage on my left.

Q. All right.

A. And thére was some kicking going on. Of course, I was down like this and some kicking was hitting me in the back.

Again from the testimony of the plaintiff:

Q. Do you know who searched you and, if so, state his name.

A. Al Phifer.

Q. All right, do you know if anything was taken out of your pockets at this time?

A. There was a little thin knife, a little knife.

Q. All right, just a pocket knife?

A. Yes, sir.

Robert Williams appeared as a witness and identified himself as a professional photographer who had covered the occurrence which is the subject matter of this litigation for its news value. He was apparently a disinterested witness. He testified, in part, as follows:

Q. All right, did you see Mr.—are you acquainted with Mr. Romie Vetters?

A. No sir.

Q. You don't know Mr. Vetters?

A. I had never seen him before this night.

Q. All right, now, did you become acquainted with him on this particular night?

A. Yes, sir.

Q. When did you first see him?

A. After there was some altercation there and there were several men around him pummeling him. I found out later it was him.

Q. When you first saw him, what was happening to him, if anything?

A. He was being beat upon.

Q. By how many persons?

A. About five.

Q. All right. Did you know any of these persons that were beating upon him?

A. Yes, sir.

Q. State their names or the names of these persons that you know.

A. One was a Mr. Al Phifer with the Waverly Police Department. The others I couldn't identify, because they were in the shadows of a building.

Q. All right, did you see Mr. Al Phifer—do you see Mr. Al Phifer in the Courtroom?

A. Yes, sir.

Q. Is he the last gentleman on the counsel table?

A. Yes, sir.

Q. Did you see Mr. Al Phifer strike Mr. Romie Vetters at any time?

A. Most of them had their backs to me, but I could hear the blows from where I was standing, about twenty-five feet away.

Q. My question though is this, did you see this gentleman strike Mr. Vetters at any time?

A. Yes, sir.

Q. What did he strike Mr. Vetters with?

A. I couldn't tell, I could just see his arm going like this.

Q. Well, which arm was going like this?

A. His right arm.

Q. Well, did you see this arm finally hit Mr. Vetters?

A. Well, I couldn't see, like I said, all their backs were to me where I was standing in the position I was.

Q. Did you see him kick Mr. Vetters at any time?

A. No, sir.

Betty Moran, a resident of the City of McEwen, whose occupation was making curtains, appeared as a witness. In her testimony she stated as follows:

Q. Did you see Mr. Berry at any time kick Mr. Vetters?

A. No. I seen Mr. Phifer kick him.

Q. Now, do you know Mr. Phifer?

A. Not personally I don't know him.

Q. Did you see him in the Courtroom?

A. Yes, he's right there.

Q. Is this the gentleman on the far end of the table that you are talking about?

A. Yes, it is.

Q. Now, what did you see Mr. Phifer do?

A. He hit Mr. Vetters and kicked him after he done, you know, started to slump over.

**94**

Q. Did he hit him and kick him before he slumped over or after he slumped over?

A. After he slumped over.

Back to the testimony of the plaintiff, Vetters:

Q. All right. Now, after you told Sheriff Bell not to point the gun at you, what, if anything, did he do?

A. He didn't do anything at that particular time.

Q. What did you do, if anything?

A. Berry grabbed me in the collar, he and Ab Henry were standing in front of me on the street. He was standing on the sidewalk and they were standing on the street.

Berry grabbed me in the collar and hit me, and at the same time right close to it, why, Ab Henry grabbed me by the left arm and they just started hitting me then.

Q. All right. Now, you are referring to Mr. Berry. Are you speaking of the gentleman which is sitting at the end of the counsel table?

A. That gentleman sitting right over there.

Q. Now, what did Mr. Berry hit you with?

A. His fists.

Q. Where did he hit you?

A. He hit me in the eye.

Q. Which eye?

A. The left eye.

Q. I beg your pardon?

A. The left eye.

Q. All right.

A. And . . .

Q. Was this the first lick that was struck on your body, the lick by Mr. Berry?

A. Yes, sir.

Vernon Curtis was sworn as a witness and during his testimony he related the following:

Q. Did you notice anyone at any time strike at Mr. Vetters with a flashlight or any other weapon?

A. No, sir, I didn't.

BY THE COURT: While he was down on the ground, were any blows, licks or kicks inflicted on him?

A. Yes, sir, Mr. Berry was kicking him.

BY MR. COLLIER: (Continuing)

Q. You said who was kicking him?

A. Mr. Berry was kicking him.

Q. This gentleman at the end of the bench over there?

A. Yes, sir.

Q. Did he just kick him one time or was he continuously kicking him?

A. He kicked him more than once.

Q. Were these light licks or hard licks, to the best you could determine, or that you did determine?

A. Pretty hard licks, I would say.

Betty Moran continued her testimony as follows:

Q. Now, and as you were sitting and after you had been placed in the patrol car, did you have the opportunity to see Mr. Berry?

A. Yes, I did.

Q. Did you see Mr. Berry strike or kick Mr. Vetters at any time?

A. No, I seen Mr. Berry hit him a couple, maybe two or three times.

Q. What did he hit him with?

A. His fists.

Q. Now, you are speaking of this gentleman—

A. Yes, sir.

Q. —at the end of the table there?

A. Um-hm

Q. And you are stating that he hit him two or three times with his fists?

A. Yes, I am.

Q. Did you see Mr. Berry at any time kick Mr. Vetters?

A. No. I seen Mr. Phifer kick him.

Defendant Berry in his testimony admitted the following:

A. * * *

And, like I say, I got there right almost the same instant as Mr. Durham appeared, and Mr. Durham either had him by the belt or the back of his collar or shirt.

Q. So, he was bent over and swinging kind of like a windmill?

A. Yes, sir.

Q. What did you do then?

A. I raised my knee and struck him in the abdomen.

Q. All right, what happened then?

A. He fell to the ground.

Q. Did this stop everything then?

A. Yes, sir.

Eddie Vetters, son of the plaintiff, including the following in his testimony:

A. All right, I come from across the railroad track. I would be running toward my father. And I saw Mr. Berry and Mr. Ab Henry. Berry was on his right side and Mr. Henry was on his left.

And Mr. Berry was kicking him in the stomach with his knee, or I would say his chest and stomach. He kicked him several times, and I heard my father say that he had had enough or please not to kick anymore or something to that extent, and he was still kicking him.

Q. That was Defendant Berry?

A. Sir?

Q. That was the Defendant Berry you are talking about?

A. Yes, sir, he was kicking him. Mr. Henry kicked him, too.

An analysis of the Court's instructions to the jury reveals a detailed and fair explanation of the law to assist the jury in its deliberations. This conclusion is substantiated by the fact that trial counsel for the plaintiff and trial counsel for each of the defendants took no exception to any part of the Court's charge.

■ The transcript of the testimony of the witnesses for both sides of the lawsuit discloses an abundance of conflicting evidence, and any such conflicts in the evidence are to be resolved by the trier of the facts. "When the evidence is in dispute it is singularly within the province of the jury to decide which version of the facts is to be accepted." *Smith v. Lees,* 431 F.Supp. 923, 927 (E.D.Pa.1977). The version of the facts obviously accepted by the jury in returning a verdict of liability as to each defendant is amply supported by substantial evidence.

Appellants contend, as previously set forth herein, that the jury's verdict had to have been based on certain "erroneous factual conclusions"—(1) that Berry did something more than enter an ongoing fray with the intent of stopping it; (2) that Phifer did more than simply pat down the plaintiff; and (3) that Phifer was responsible for the injuries sustained by plaintiff at the hands of Sheriff Bell and Chief Deputy Henry prior to the pat down at Trooper Durham's patrol car. To adopt such contention of appellants would require this Court to ignore all consideration of the evidence submitted by plaintiff. It would also require that we ignore the instructions of the trial judge when he charged the jury:

Now, keep in mind here that each of these defendants is chargeable only for his own individual actions. Neither defendant is chargeable with the acts of Sheriff Bell; neither of the defendants is chargeable with the acts of Chief Deputy Henry or any other—or the State Highway Patrol or any other officer. Neither defendant is chargeable with the actions of the other defendant. So, this case in which we have—in effect we have two cases here of Vetters against Berry and Vetters against Phifer.

### COMPENSATORY DAMAGES

■ With respect to the issue of compensatory damages the district judge instructed the jury in the following language:

I am first going to give you the elements which you may consider in the assessing of any compensatory damages if you find that such damages should be assessed.

The basis is that you will assess if you find liability the plaintiff's damages at such an amount within the limits sued for as in your sound judgment and discretion will fairly and honestly compensate the plaintiff for his injuries, if any, resulting from and proximately caused by the defendants' actions, if any.

There is no fixed rule by which defendants—by which damages may be mathe-

matically computed or calculated, but there are certain compensable elements the jury may take into consideration. These are—still talking about compensatory damages—the nature and extent of the plaintiff's injuries, if any; whether those injuries are permanent or temporary; his pain, suffering, fright, mental anguish, physical disfigurement, emotional distress, humiliation, mental distress, if any have been shown; expenses such as doctor, medical and hospital bills paid or to be paid by the plaintiff in an effort to obtain treatment or a cure for such injuries, if any.

If you find plaintiff has sustained such injuries, then it will be your duty to go further and consider loss of time, wages, impairment to earning capacity and also impairment of his life together with the destruction of his natural rights.

The Court's instructions to the jury on the issue of compensatory damages were accepted by counsel for the respective parties and there is substantial evidence to support each of the $520 awards on this issue.

## PUNITIVE DAMAGES

■ Appellants do not dispute that punitive damages may be awarded in a Section 1983 case for malicious and wanton disregard of a plaintiff's constitutional rights, but they maintain that the damages recovered by Vetters are not supported by the evidence, are grossly excessive by any standard and represent a verdict against absent defendants Bell and Henry. Punitive damages have been held to be allowed on the basis of punishment of the wrongdoer, not so much on the nature and extent of the injury as on the "oppression of the party who does the injury." *Johnson v. Husky Industries, Inc.,* 536 F.2d 645, 650 (6th Cir. 1976). The individual conduct of Berry and Phifer as established by the evidence on the trial of this cause connected each one as a wrongdoer in his contacts with plaintiff and warranted the jury in returning verdicts on the issue of punitive damages.

■ The fact that the jury awarded the plaintiff $25,000 in punitive damages against Berry and $10,000 in punitive damages against Phifer would, of necessity, have required separate and individual consideration of each defendant (as instructed by the trial judge). The disparate awards are in direct contravention of appellants' claim that the action of the jury represents a verdict against the absent defendants Bell and Henry.

■ As to the claim by appellants that the awards of damages by the jury are grossly excessive by any standard, Judge Robert Taylor, in *Gaston v. Gibson,* 328 F.Supp. 3, 5 (E.D.Tenn.1969), had a similar contention for consideration and determined it in the following manner:

Each defendant's main contention is that the verdict of $10,000.00 compensatory and $30,000.00 punitive damages is excessive and shows prejudice by the jury. There are several civil rights cases where verdicts were less than a total of $10,-000.00. However, in suits where punitive damages are proper, there have been larger verdicts. In *Butts v. Curtis Publishing Company,* 225 F.Supp. 916 (N.D. Ga., 1964), a verdict of $400,000.00 punitive was held proper in a libel and slander case. In *Bucher v. Krause,* 200 F.2d 576, 587 (C.A. 7, 1953), $100,000.00 was held proper when a gunshot wound caused serious and permanent damage to plaintiff's buttocks. In *Reynolds v. Pegler,* 223 F.2d 429 (C.A. 2, 1955) $1.00 compensatory damages and $175,000.00 punitive damages in a libel and slander case were approved. In addition to obvious common law torts defendants committed, the entire procedure for handling juvenile offenders in Tennessee was disregarded. T.C.A. §§ 37–250, 37–251, 37–252. Even procedural rights given adult offenders were not observed. T.C.A. § 40–806. The conduct of defendants showed disregard for procedural safeguards which our Anglo-American system has established. This Court is reluctant to invade the particular province of the jury in evaluating the value of civil rights. *Collum v. But-*

*ler,* 288 F.Supp. 918 (N.D.Ill., 1968). The shocking conduct shown rebuts any inference of prejudice and passion in the jury's verdict.

The jury here returned verdicts for compensatory and punitive damages after having been instructed by the trial judge in detailed and easily understandable language as to the type of proof necessary (guidelines) for the jury to consider in determining whether or not damages should be awarded to plaintiff against defendant(s). The jury had listened to substantial evidence of the elements necessary to award both types of damages. Under these circumstances this Court will not invade the particular province of the jury in evaluating the value of plaintiff's civil rights.

Affirmed.