97 F.3d 1451
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Samuel CAMPBELL, Plaintiff-Appellant,
v.
Hugh MORRISON, Lawrence Wideman, Patrick Stano, Jan
Gelsleichter, Michael Scarborough, Robert Dwyer,
Defendants-Appellees.
 No. 94-1443.
 United States Court of Appeals, Sixth Circuit.
 Sept. 9, 1996.
 
 Before: MERRITT, Chief Circuit Judge; DAUGHTREY, Circuit Judge; and OAKES, Circuit Judge.*
 MERRITT, Chief Judge.
 
 
 1
 This is an appeal from a verdict for Defendants-Appellees in this action alleging civil rights and state law violations arising out of alleged police brutality against Plaintiff-Appellant, Samuel Campbell, in the course of effectuating an arrest. Seven issues are raised on appeal: (1) whether the trial court erred in directing a verdict for Defendants Stano, Gelsleichter, Scarborough and Dwyer on the portion of Plaintiff's § 1983 claim based on the use of excessive force; (2) whether the trial court erred in directing a verdict in favor of all the Defendants with respect to Plaintiff's claim of a civil rights conspiracy under 42 U.S.C. § 1985; (3) whether the trial court erred in directing a verdict in favor of five of the six Defendants with respect to Plaintiff's claim of racially-motivated conduct pursuant to 42 U.S.C. § 1981; (4) whether the trial court erred in directing a verdict for all six Defendants on Plaintiff's state law claim of gross negligence; (5) whether the trial court erred in failing adequately to inform counsel prior to closing arguments of the jury instructions it would give, including ruling on the instructions requested by the parties; (6) whether the trial court erred in refusing to give the jury instructions requested by Plaintiff and (7) whether statements made by the trial court while instructing the jury were prejudicial to Plaintiff.
 
 
 2
 We reverse the trial court and remand the case on the entire § 1983 claim as to Defendants Stano, Gelsleichter, Scarborough and Wideman. It is clear that the trial court failed to view the evidence in the light most favorable to Plaintiff and to draw reasonable inferences therefrom, as required when deciding a motion to direct a verdict. If the jury had believed Plaintiff and rejected the contradictory testimony of the Defendant officers Stano, Gelsleichter, Scarborough and Wideman, the jury could have found that these officers used excessive force in effectuating Plaintiff's arrest. By finding that, as a matter of law and fact, these four Defendants did not participate in the beating and taking the matter from the jury, the trial judge improperly weighed the credibility of the witnesses instead of allowing the jury to do so. On remand, the trial court shall allow the entire § 1983 claim against Defendants Stano, Gelsleichter, Scarborough and Wideman to go to the jury and not just a portion thereof.
 
 
 3
 Because we find that a plaintiff may bring both a claim of gross negligence and a claim of assault and battery under Michigan law, we also reverse the trial court and remand the case to reinstate the gross negligence claim against all six Defendants. We affirm the District Court on the other matters presented on appeal. Plaintiff did not appeal the dismissal of the state claims of assault and battery, false imprisonment and false arrest against Defendants Gelsleichter, Scarborough, Stano and Wideman.
 
 I.
 
 4
 Plaintiff Samuel Campbell, an African-American, was driving a friend's car with three other African-American occupants in Detroit, Michigan. The group stopped at a store and a car with two white males pulled up behind them. Although not known to Plaintiff at the time, the car contained Defendants Hugh Morrison and Robert Dwyer, plainclothes police officers on duty in an unmarked police car. Plaintiff and the other occupants of the car purchased items at the store and then drove to the house of Charles Williams, one of the car's occupants. The unmarked car with the two officers followed them and when Plaintiff pulled over to park the car at Mr. William's house, the unmarked car put on its flashers. All the occupants of Plaintiff's car got out of the car. Officer Morrison left his car and approached Plaintiff to ask for Plaintiff's license and the car registration. From this point forward, the facts are in dispute. We reiterate them here in some detail because they are relevant to our holding.
 
 
 5
 Plaintiff contends that because the officer was not in uniform Plaintiff was suspicious and asked the officer for identification. Plaintiff says that the officer barely "flipped" something in front of his face. Plaintiff contends, however, that despite the fact that the officer failed to show Plaintiff what Plaintiff considered to be adequate identification, Plaintiff started to look for his license, explained to the officer that he was driving a friend's car and asked the officer why he had been pulled over.
 
 
 6
 While Plaintiff was talking with Officer Morrison, Officer Robert Dwyer, the other plainclothes officer in the car with Officer Morrison, allegedly threw Charles Williams, one of the car occupants, onto the back of Plaintiff's car. When Plaintiff asked Officer Dwyer why he did that, Officer Dwyer allegedly swore at him and told him to "shut ... up." Plaintiff asked again and received the same answer. Plaintiff contends that Officer Dwyer then came towards Plaintiff in order to grab him. At this point, Officer Morrison unholstered his gun and pointed it at Plaintiff, who raised his hands in the air. Plaintiff says he never touched either officer and that Officer Dwyer attacked him first.
 
 
 7
 According to Plaintiff, at this point a female occupant of the car, Gwen Walker, walked between Officer Dwyer and Plaintiff and Officer Dwyer knocked her down. When Plaintiff tried to help her up, Officer Dwyer hit Plaintiff on the head with either the Officer's service revolver or a flashlight. Officer Morrison then jumped on Plaintiff and they both fell to the ground.
 
 
 8
 Plaintiff testified that four more officers arrived then and started beating him also. A number of other officers that Plaintiff was unable to identify also arrived on the scene and allegedly participated in the beating. Plaintiff says he became unconscious and woke up handcuffed and being dragged to the police car. Plaintiff was taken to a hospital and treated for head and knee injuries and released.
 
 
 9
 Plaintiff was subsequently charged with assaulting a police officer, a charge later dismissed for failure to prosecute, and Ms. Walker and Mr. Williams were also cited for the incident, but the tickets were dismissed. At trial, all the occupants in Plaintiff's car testified to this sequence of events.
 
 
 10
 The Defendants present a conflicting account of the event. Defendants Morrison and Dwyer assert that they first spotted Plaintiff Campbell because he was parked in a no-parking zone at the store. Defendants Morrison and Dwyer followed Plaintiff from the store parking lot because the officers had entered the license plate number into the computer to see if the car was stolen and the results had not yet come back. Officer Morrison testified that when he approached the vehicle to ask for license and registration, Plaintiff, who was a security guard for the City of Detroit, indicated to Officer Morrison that he was a police officer, swore at Officer Morrison and told him he would not show him a thing. Officer Morrison stated that Plaintiff continued to refuse to show his police ID and again swore at Officer Morrison.
 
 
 11
 Officer Dwyer testified that he was standing at the rear of Plaintiff's car observing. When the occupants left the car he called for backup. Officer Dwyer stated that Mr. Williams came toward him and Officer Dwyer asked Mr. Williams for identification. When Mr. Williams said he didn't have any, Officer Dwyer patted him down for weapons. Officers Morrison and Dwyer testified that they feared the car occupants might be armed. Officer Dwyer stated that Plaintiff then walked passed him and pushed him with enough force to knock him down. Officer Dwyer then radioed for "help," which means that an officer is in trouble and is more urgent than calling for "backup." Officer Dwyer testified that Mr. Williams tried to take the radio from him.
 
 
 12
 Officer Morrison testified that Plaintiff started to reach into his coat and Office Morrison told him to halt. Plaintiff failed to halt and started toward Officer Morrison yelling obscenities. Officer Morrison then pulled out his weapon and pointed it at Plaintiff. Officer Morrison stated that Gwen Walker grabbed the arm holding the gun. Office Morrison threw her off and reholstered his weapon because he was afraid she would take it. Officer Morrison then grabbed Plaintiff's left arm to prevent him from leaving at which time Officer Morrison stated that Plaintiff struck him in the face. Officer Dwyer then pushed Plaintiff up against a nearby van and told him he was under arrest. Ms. Walker then jumped on Officer Dwyer's back. Officer Morrison pulled her off and then went to grab Plaintiff from behind.
 
 
 13
 Officer Morrison testified that he then became aware that Officer Gelsleichter, another Defendant, had arrived. Officer Gelsleichter grabbed Plaintiff's arm in order to assist Officer Morrison but Plaintiff threw him off. Plaintiff then fell on top of Officer Morrison. The next three officers, Defendants Scarborough, Stano and Wideman, arrived at the scene. Other officers then arrived and the altercation continued for a few more minutes. Plaintiff was then taken to the hospital and treated for his injuries.
 
 
 14
 Defendants Morrison and Dwyer testified that they never struck Plaintiff with a flashlight or a service revolver and that they used only the force necessary to subdue and arrest Plaintiff. The other four Defendants contend that they only assisted Defendants Morrison and Dwyer in subduing Plaintiff and that they neither delivered any blows themselves nor saw any being delivered by Officers Morrison or Dwyer.
 
 
 15
 At the close of Plaintiff's case, Defendants moved for a directed verdict as to all the claims against them. The trial court granted the motion in part as to Defendants Gelsleichter, Scarborough, Stano and Wideman when it narrowed the jury's deliberations under the § 1983 claim as to these four Defendants solely to the issue of whether these four Officers had witnessed fellow Officers Dwyer and/or Morrison beating Plaintiff and had failed to intervene, taking from the jury the issue of whether these four Defendants had also used excessive force in effecting the arrest. The trial court found that there was no evidence that Defendants Gelsleichter, Scarborough, Stano and Wideman had participated in the alleged beating and that, at most, they may have failed to intervene to stop a beating. The jury ultimately found these four Defendants not liable. The trial court allowed the jury to decide the excessive force issue as to Defendants Morrison and Dwyer, and it found no liability.
 
 
 16
 The trial court also dismissed the §§ 1985 and 1986 claims against all the Defendants and dismissed the § 1981 claim against all Defendants except Officer Morrison. The court dismissed the state law assault and battery, false arrest and false imprisonment claims against Defendants Gelsleichter, Scarborough, Stano and Wideman and dismissed the gross negligence claim against all the Defendants.
 
 II.
 
 17
 A. § 1983 Excessive Force Claim Against Defendants Gelsleichter, Scarborough, Stano and Wideman
 
 
 18
 Plaintiff appeals from what amounted to the District Court's grant of a motion for a directed verdict by Defendants Gelsleichter, Scarborough, Stano and Wideman concerning the use of excessive force in effectuating an arrest in violation of 42 U.S.C. § 1983. On a motion for directed verdict, the district court must view the evidence in the light most favorable to the party against whom the motion is made, and must give that party the benefit of all reasonable inferences. Having done so, a directed verdict is proper only if the court finds that reasonable minds could not differ as to the governing facts. The district court is not to evaluate the credibility of the witnesses in a jury trial. McDowell v. Rogers, 863 F.2d 1302, 1307 (6th Cir.1988). Therefore, a court may direct a verdict only when the evidence leads to but one reasonable conclusion. Erskine v. Consolidated Rail Corp., 814 F.2d 266, 269 (6th Cir.1987) (en banc). There must be some evidence on which the jury could reasonably find for plaintiff. Id. This Court reviews the grant of a motion for a directed verdict de novo. Id.
 
 
 19
 The trial court ruled that as to Plaintiff's § 1983 claim against Defendants Gelsleichter, Scarborough, Stano and Wideman, it would charge the jury only as to whether these four Defendants stood by and watched an illegal beating and failed to intervene. The District Court did not allow the jury to decide whether these four Defendants had actually participated in the beating as alleged by Plaintiff because it found that there was no evidence that any officers, other than Morrison and Dwyer, participated in the use of force. This ruling was error and amounted to a directed verdict for Defendants Gelsleichter, Scarborough, Stano and Wideman. If the matter had not been taken from the jury and if the jury had believed the testimony of the Plaintiff and his witnesses, that testimony and the reasonable inferences drawn therefrom might have led the jury to find that one or more of the next four officers to arrive on the scene, that is Defendants Stano, Gelsleichter, Scarborough and Wideman, could have used excessive force under the circumstances. The testimony about the incident is very much in dispute and from the record it appears that the District Court improperly weighed the credibility of the witnesses in arriving at its conclusion, thereby usurping deliberations reserved for the jury.
 
 
 20
 In Hancock v. Dodson, 958 F.2d 1367, 1374-75 (6th Cir.1992), a panel of this Court stated in dicta that the combination of testimony that an officer admitted touching an arrestee in conjunction with testimony that a beating had occurred could provide a jury question as to whether the conduct constituted excessive force, depending on the circumstances. The evidence, both direct and circumstantial, if viewed most favorably to the Plaintiff, as required, raises a jury question about the actions of Defendants Stano, Gelsleichter, Scarborough and Wideman. See, e.g., Adams v. Metiva, 31 F.3d 375 (6th Cir.1994) (grant of summary judgment for defendants reversed in § 1983 case due to contested facts); Hill v. McIntyre, 884 F.2d 271 (6th Cir.1989) (reversing directed verdict for defendants in § 1983 case); McDowell v. Rogers, 863 F.2d at 1307 (directed verdict reversed for defendants because question of fact for jury as to whether officers used excessive force in effecting arrest); Vetters v. Berry, 575 F.2d 90, 95 (6th Cir.1978). Of course, the jury might have found either that the officers never saw anything, as some of the officers claim, or that they acted reasonably given the scene that they confronted when they arrived--Officers Morrison and Dwyer involved in an altercation with between one and four persons.
 
 
 21
 There is testimony by Defendants in the record before us that supports Plaintiff's claim of excessive force by Defendants Stano, Gelsleichter, Scarborough and Wideman. For example, Defendant Stano concedes that when he arrived on the scene Defendant Morrison was on the ground with Plaintiff causing Defendant Stano to grab the Plaintiff's arm to "subdue" him. (Trial Transcript[2] at 756-57, Joint Appendix[3] at 1005A-06A ("I grabbed on to one of his arms .... and held on until it was over."); see also Tr.Trans. at 180, J.A. at 429A ("I was holding on to him.")) Defendant Stano also testified that officers Gelsleichter, Scarborough, and Wideman were present when Defendant Stano grabbed the Plaintiff's arm and that all the officers present were "hanging on to" Plaintiff. (Tr.Trans. at 756, J.A. at 1005A) Defendant Gelsleichter admitted to grabbing Plaintiff's arm in order to assist Officer Morrison. (Tr.Trans. at 742, J.A. at 991A ("I grabbed Mr. Campbell's arm...."); see also Tr.Trans. 626, J.A. at 875A (same)). Officer Scarborough testified "I grabbed his arm with both arms and basically held onto it." (Tr.Trans. at 791, J.A. at 1040A)
 
 
 22
 The testimony of Plaintiff and his witnesses, if believed by the jury, would also have allowed the jury to find in Plaintiff's favor. Plaintiff testified that all six Defendants "jumped" him and that "at least" six officers were striking him. (Tr.Trans. at 104, 116, 118, J.A. at 352A, 365A, 367A) Plaintiff later stated that although he could not identify the officers who beat him, he noticed two marked police cars at the scene and testified that the next four officers that arrived on the scene after Officers Morrison and Dwyer also beat him. There is testimony that Officer Gelsleichter was the next officer on the scene, followed by Officers Stano and Wideman, who arrived together, simultaneously with Officer Scarborough. (Tr.Trans. at 175, 182, J.A. at 424A, 431A)
 
 
 23
 There is testimony in the record that all the officers present, eventually numbering between 15 and 18, participated in beating Plaintiff. It has been stipulated that Defendants Gelsleichter, Scarborough, Stano and Wideman were present. For example, Gwen Walker, an occupant in the car with Plaintiff, when asked how many officers jumped Plaintiff testified:
 
 
 24
 It was a lot. I didn't count them but I know that they were all over him. For a minute I didn't even see him.... I couldn't even see [Plaintiff] because there was [sic] so many policemen around him kicking him and beating him.
 
 
 25
 (Tr.Trans. at 474-74, J.A. at 723A-24A) Another witness who was also present in the car with Plaintiff during the incident, Katrina Williams, testified that "I just know it was like about 15 cops down on him beating him...." (Tr.Trans. at 198, J.A. at 447A) Ms. Williams also testified that "all" of the officers present were holding Plaintiff down. (Tr.Trans. at 199, J.A. at 448A) Charles Williams, another passenger in the car with Plaintiff at the time of the incident, testified that all the officers present beat Plaintiff:
 
 
 26
 The rest of the guys started to jump in on top of them [Officer Morrison and Plaintiff]. There was [sic] about 15 guys there.... They was [sic] beating the hell out of him. They was [sic] kicking him and beating him and even when they put the handcuffs on him they was still kicking and beating him.
 
 
 27
 (Tr.Trans. at 261, J.A. at 510A) Because there was evidence in the record from which a jury could reasonably have found for Plaintiff, a directed verdict was improper on the § 1983 claim as to the matter of the use of excessive force by Defendants Gelsleichter, Scarborough, Stano and Wideman. We therefore reverse and remand the claim to the District Court.
 
 
 28
 B. Gross Negligence Claim Against All Defendants
 
 
 29
 The trial court directed a verdict for all six Defendants with respect to Plaintiff's state law claim of gross negligence. The trial court ruled that the claim was inconsistent with an intentional tort theory. In ruling the judge stated:
 
 
 30
 I see no basis for having a gross negligence count when we're proceeding with assault and battery and false arrest. So I will dismiss the gross negligence count.
 
 
 31
 (Tr.Trans. at 534, J.A. at 783A) Contrary to the trial judge's ruling, there is nothing in Michigan law that prohibits bringing a claim of gross negligence as well as a claim of assault and battery. Proceedings pursuing both claims have advanced in both Michigan state courts and the federal courts. See, e.g., Roxbury v. Paul, 838 F.Supp. 1204 (W.D.Mich.1992), aff'd, 7 F.3d 234 (6th Cir.1993); Telerico v. Stolicker, No. 91-004899 (Mich.Ct.App. Dec. 21, 1993) (attached as Appendix B to Plaintiff's brief). The jury therefore could consider either the intentional torts, such as assault and battery, or, alternatively, even if the jury believed Defendants were acting within the scope of their employment in their conduct, it could find the Defendants' conduct negligent where it was "so reckless as to demonstrate a substantial lack of concern for whether an injury results." Adams v. Metiva, 31 F.3d at 388.
 
 
 32
 The Defendants do not contest the viability of this claim and instead argue that Plaintiff waived this claim. The Defendants argue that the claim is waived for failure to list it in the pretrial order and contend that the trial court found that the claim was not pled. Defendants do not cite to the place in the record where the trial court made this ruling and we have been unable to locate such a ruling in the record. Assuming the ruling was made by the trial court, it would be in error. The claim is adequately pled in the pre-trial order:
 
 
 33
 Plaintiff's state law claims are based upon assault and/or battery, false arrest and false imprisonment, and gross negligence, which is defined by MCLA 691.1407(2)(c) as conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.
 
 
 34
 (Pre-trial Order at 7, J.A. at 94A) Furthermore, Plaintiff alleges that Defendants acted in "reckless disregard" for Plaintiff's civil rights. (Id. at 5, J.A. at 92A) Given these references, the Defendants had sufficient notice of these claims to avoid waiver. The trial court's ruling on Plaintiff's state law claim of gross negligence is reversed.
 
 C. Jury Instructions
 
 35
 Plaintiff argues (1) that the trial court, in violation of Federal Rule of Civil Procedure 51, did not inform the parties before closing arguments of the substance of the instructions it would give; (2) that the substance of specific instructions was either incorrect or improperly omitted and (3) that the trial court never gave the parties adequate opportunity to object to the instructions the trial court proposed.
 
 
 36
 First, although the trial court's recitation to the parties of the contents of the instructions was brief, it was adequate under Rule 51 which requires the court to "inform counsel of its proposed action upon the requests prior to their argument to the jury....":
 
 
 37
 On 1983, I am going to give two instructions. One that objectively reasonable is the standard ... and second, I will read from these [Supreme Court] cases. If anyone who is there has a duty to interfere. I will read what those cases say. That takes care of 1983. I have dismissed all the state claims against Wideman, Stano, Gelsleichter, Scarborough, so I will have just standard assault and battery, a standard false arrest claim from the Michigan Jury Instructions as to those two. As to 1986, I have dismissed it completely. I have dismissed 1985 completely. 1981, I will pick up an instruction from Devitt & Blackmar as against Officer Morrison only.
 
 
 38
 (Tr.Trans. at 818, J.A. at 1067A) Plaintiff was on notice of what the court intended to say, if not aware of the specifics. Furthermore, both counsel were present when the court dictated the verdict form in chambers for transcription.
 
 
 39
 Second, Defendants allege that Plaintiff waived his right to appeal the specific instructions given because his counsel objected specifically to only three. (Tr.Trans. at 925-27, J.A. at 1172-74A) Plaintiff contends that his counsel tried to object and the judge would not let him. It appears from the record that the judge displayed some impatience with counsel when discussing the jury instructions. (Tr.Trans. at 901-02, 925-27, J.A. at 1104A-05A, 1172A-77A) We therefore agree with Plaintiff that it was probably futile for his counsel to try to recite all his numerous objections into the record. The judge also refused to allow Plaintiff to enter his proposed instructions into the record, and Plaintiff's counsel filed them with the clerk's office the next day. (Tr.Trans. at 928, J.A. at 1175A) We find that under the circumstances this was sufficient to preserve Plaintiff's objections for appeal.
 
 
 40
 As to the merits of Plaintiff's argument that the instructions were improper, the only instruction that may have affected the outcome of the case resulted from the trial judge's comments that he found as a matter of fact and law that Defendants Wideman, Stano, Gelsleichter and Scarborough did not participate in the beating of Plaintiff. (Tr.Trans. at 911-12, J.A. at 1159A) Because we are remanding the entire Section 1983 claim as to Defendants Wideman, Stano, Gelsleichter and Scarborough, we need not reach this issue.
 
 
 41
 As to Defendants Morrison and Dwyer, we do not believe that the trial court's comments regarding the culpability of Defendants Wideman, Stano, Gelsleichter and Scarborough tainted the jury's deliberations concerning these two Defendants.
 
 
 42
 D. Directed Verdict of § 1985 Claim (civil conspiracy) As to All Defendants
 
 
 43
 A civil conspiracy under § 1985 requires a conscious agreement between two or more persons to injure another by unlawful action. Plaintiff must present evidence of a single plan and commission of an overt act in furtherance of that plan. Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971). Plaintiff presented no evidence of a joint plan to deprive a person of equal protection under the law. The only evidence Plaintiff offers to support his claim that the conduct was racially motivated is the fact that he is black and the defendants white. This type of conclusory allegation without more is insufficient to support the claim and the District Court was correct to direct a verdict for all Defendants on this claim. The directed verdict for Defendants as to the claim of civil conspiracy under 42 U.S.C. § 1985 is therefore affirmed.
 
 
 44
 E. Directed Verdict on § 1981 Claim as to All Defendants Except Morrison
 
 
 45
 Under 42 U.S.C. § 1981 the plaintiff must demonstrate that a plaintiff was denied full and equal benefit of the laws due to his race. The District Court did not err in directing a verdict for all Defendants except Defendant Morrison. The trial court allowed the claim to go forward as to Officer Morrison because there was testimony that he made a racially-motivated statement, although no liability was found by the jury.
 
 
 46
 The only evidence of racial motivation against the other five Defendants consisted of a statement made by either Officer Wideman or Officer Stano about "niggers staying in their own neighborhood." Plaintiff's counsel concedes, however, that Plaintiff does not know who made the statement. This leaves only the fact that Plaintiff is black and Defendants are white as "evidence" to show that the altercation was racially motivated. Like the Section 1985 claim, this is insufficient to sustain the claim and the directed verdict as to the § 1981 claim is affirmed.
 
 
 47
 For the foregoing reasons we affirm in part, reverse in part and remand for proceedings consistent with this opinion.
 
 
 
 *
 The Honorable James L. Oakes, Senior Judge, United States Court of Appeals for the Second Circuit, sitting by designation
 
 
 [2]
 References to the trial transcript will be referred to hereinafter as "Tr.Trans. at ___."
 
 
 [3]
 References to the Joint Appendix will be referred to hereinafter as "J.A. at ___."