Ronnie J. CERJAN, Plaintiff,

v.

Raymond G. FASULA, et al., Defendants.

Civ. A. No. C 77–265 Y.

United States District Court,
N. D. Ohio, E. D.

Feb. 19, 1981.

Edward F. Siegel, Mayfield Heights, Ohio, and Gordon Beggs, Cleveland, Ohio, for plaintiff.

Daniel Herron, Asst. Prosecutor, Jefferson, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

ANN ALDRICH, District Judge.

This action for monetary damages and equitable relief was initiated by Ronnie Cerjan, a former deputy sheriff, to redress the alleged deprivations of his constitutional rights in violation of 42 U.S.C. § 1983, and the First and Fourteenth Amendments to the United States Constitution. The defendants are Raymond Fasula,[1] the former

Sheriff of Ashtabula County, Ohio, and William K. Johnston,[2] the present Sheriff. This Court has jurisdiction under 28 U.S.C. § 1343(3).

Cerjan contends that (1) he was discharged from his employment as a direct result of exercising rights guaranteed him by the First and Fourteenth Amendments; (2) prior to his discharge defendant Fasula attempted to "chill" the exercise of his First Amendment rights to freedom of speech and freedom of association by assigning him to a specially created, unnecessary, degrading, and personally hazardous duty within the Sheriff's Department; (3) defendant Fasula failed to afford him a hearing on his dismissal in violation of his right to due process of law; and (4) there was no evidence to support the charge for which he was dismissed. Cerjan further contends that at all times relevant to this action, Fasula acted under color of state law.

Prior to trial, Cerjan waived Count V of his complaint, and also waived his demand for a jury trial. This action was tried before the Court on August 13 and 14, 1980. At the close of the trial, the Court found defendant Fasula liable in his official capacity on all four counts. Fasula was found liable in his individual capacity on Count II. The Court now sets forth its reasons for these rulings.

### I

Cerjan was employed as a Deputy Sheriff in the Ashtabula County Sheriff's Department from November, 1970 until July, 1974, and again from April, 1975 until April 19, 1976. He was at all times a non-policymaking employee whose duties included patrolling the county, arresting wrongdoers, and carrying out the orders of the Sheriff.

Fasula was the Sheriff of Ashtabula County during the latter period of Cerjan's employment, and was a candidate for re-election to that office in the 1976 November

---

1. Raymond Fasula is sued individually, and in his official capacity as Sheriff of Ashtabula County, Ohio.

2. William Johnston is sued only in his official capacity as Fasula's successor in office.

election. Fasula was opposed by William Johnston, an independent candidate, who had also been a deputy in Fasula's administration until July of 1975. Cerjan was an open and active supporter of Johnston's candidacy.

At least fifteen months prior to the election William Johnston's intention to run for Sheriff was well-known in the Department, and Fasula's expectation of support from his deputies and others in his administration was equally well known. Lee Truckey, one of Fasula's deputies, testified that as early as August, 1975, Fasula told him to decide who he was going to support and to "stay away from Bill Johnston or find a new job". This conversation was not disputed by Fasula.

By the Fall of 1975, the members of the Sheriff's Department were divided according to the candidate each was supporting, and it was during this time that problems began to develop between Fasula and Cerjan. In November, Fasula summoned Cerjan to his office to reprimand him for making "derogatory" remarks about Fasula, and threatened to terminate him if any more remarks were made by him in public. According to Fasula, Cerjan's remark was a violation of Section III, Paragraph 9 of the Rules and Regulations of the Sheriff's Department, which prohibits deputies from discussing the characters of other deputies with any persons not connected with the Department. Cerjan's undisputed testimony was that while discussing Johnston's candidacy with other deputies at a football practice, he had remarked that if Johnston were elected Sheriff, "maybe a year from now things would be different."

A mandatory meeting was held for all members of the Sheriff's Department on November 14, 1975. Although Fasula was present, the meeting was conducted by Chief Deputy Murray Louis, who described it as a purely official one. However, toward the end of the meeting Fasula's candidacy for Sheriff became the topic of discussion. At this point, the evidence is in dispute. Cerjan contends that Fasula told the deputies he expected their support because

he signed their paychecks and supported their families; and that Louis remarked that things could be made "rough" for them if they did not support Fasula. As an example, Louis stated that rather than firing anyone, the administration could force them to quit by doing such things as scheduling deputies to two hours on duty and two hours off. This latter remark was also recalled by the witness, Audrey Svec, a former employee of the Sheriff's Department. According to Louis, his statement was that "anyone who could not support the man who hired them should quit". Fasula testified that he merely asked the deputies for their support. Both Louis and Fasula denied that any threats were made regarding job or shift changes.

The Court is of the opinion that while no actual threats may have been made, both Fasula and Louis attempted to, and did, create the impression that pressure was being exerted to coerce support for Fasula.

## II

On Saturday, January 10, 1976, Cerjan and his wife attended a FOP dance where they socialized openly with Bill Johnston and his wife, in the presence of Fasula. The following Monday, January 12, 1976, Fasula appointed Cerjan as a security deputy within the Ashtabula County Jail.

The conditions in the jail were deplorable during this time, and the poor physical condition of the jail as well as incidents within the jail between inmates necessitated the institution of additional security measures. There were approximately 35–40 prisoners in the jail, and there had been outbreaks of vandalism, attempted escapes, and sexual assaults. In December, 1975, the Chief Jailer, William Pitkin, was required to hospitalize and then transfer from the jail a young male prisoner who was sexually assaulted. Pitkin immediately reported the problems to Chief Deputy Louis and to Fasula.

In response to these problems, Fasula established a security detail which consisted of either the jailer or one of the road deputies making hourly walk-through checks of the jail. Fasula then conferred with Lt.

Robert Peet, who was in charge of the Uniform Division (Cerjan's division), and jail security, and decided that it was necessary to place someone inside the jail. On January 12, 1976, Fasula posted a Memorandum announcing the creation of the duty and that Cerjan had been selected to the jail detail.[3]

According to Peet, several deputies were considered for this jail duty, but Cerjan was chosen because he was the "most capable" deputy, had the "most tenure", the "most training", and had "firearm training"[4]. Fasula, on the other hand, gave no indication that he ever considered anyone else. In fact, he testified that he felt Cerjan was the only one that could initially be tried in the jail because of his experience and tenure, and because Fasula considered him to be a "tough kid" who excelled in any physical activity. Cerjan contends he was selected for the jail duty because of his activities in support of Johnston, and as a direct result of his association with Johnston at the dance the previous Saturday night.

Cerjan began this jail duty on January 14, 1976, and worked a 6:00 P.M. to 2:00 A.M. shift[5], Wednesday through Sunday, for six consecutive weeks. He had Mondays and Tuesdays off. He was locked in the jail with the prisoners and was not allowed to leave unless there was an emergency. He testified that most of the time no radio was available to him because the road deputies took them all out before he came on duty, and that when he did receive a radio it was inoperable because the steel structure of the building prevented transmission to the dispatcher's office. On Mondays and Tuesdays, no replacement deputy was assigned to the jail. On those nights the jailer would visit the jail "as often as possible". Both Fasula and Peet testified

this was because the Sheriff's Department was "short on manpower".[6]

One week after Cerjan was assigned to the jail duty, January 19, 1976, Fasula posted another Memorandum which specified the procedure to be followed in the event of a "possible hostage situation." Generally, the Memorandum directed that under no circumstances would prisoner demands be met, and that the shift corporals or jailer would take no overt action until ordered to do so by superior officers. Prior to the creation of the jail duty there was no policy in the Department regarding a hostage situation.

At the end of six weeks, Fasula abolished the jail guard detail and reverted to having deputies make regular hourly checks of the jail with approximately 15 minutes spent in with the prisoners.

Cerjan asserts that Fasula assigned him to this "specially created, unnecessary, degrading, and personally hazardous duty" in the jail in an attempt to (1) intimidate him into relinquishing his rights of free speech, assembly, and association; (2) cause him to relinquish his friendship and association with, and support of, Johnston; and (3) cause him to voluntarily terminate his employment with the Sheriff's Department. He further contends that the decision to place him in the jail was precipitated by his activities at the FOP dance on January 10, 1976.

Upon consideration, the Court makes the following findings regarding the jail duty:

Ronnie Cerjan was the only deputy assigned to, or even considered for, the jail guard duty; he worked a shift that was different from the regular shifts in the Sheriff's Department; he was not rotated to a different shift at the end of the normal

---

3. The Memorandum specified that Cerjan would have a portable radio and wear a regulation uniform; however, he was not permitted to wear any weapon, handcuffs, hat, or a whistle with a chain.

4. The Court has difficulty understanding the relevance of Cerjan's firearm training in the selection process since he was not allowed to carry a gun within the jail.

5. There were three regular eight-hour shifts in the Sheriff's Department: 8:00 A.M. to 4:00 P.M.; 4:00 P.M. to 12:00 A.M.; and 12:00 A.M. to 8:00 A.M. Deputies worked one shift for 28 days, then rotated to a different shift.

6. There were 42 employees under Peet's supervision at that time.

period of 28 days; and no one replaced him on the two days he was off duty each week. Accordingly, the jail duty was specially created for Cerjan by Fasula.

The Court has previously noted the conditions of the jail that warranted additional security measures; however, to the extent that the Sheriff's Department was so short on manpower that it could not spare one deputy to replace Cerjan on Mondays and Tuesdays, and the fact that there were no problems in the jail on those nights, the jail guard duty for the remaining five nights of the week was unnecessary.

Cerjan in effect spent his shift in jail. He was not allowed to leave for any reason; thus, he was required to use the same toilet facilities the prisoners used, with no privacy or protection at all. Therefore, the jail duty was degrading to Cerjan.

Sheriff Fasula's prohibition against wearing a weapon and handcuffs into the jail was reasonable as a precautionary measure. However, to the extent that Cerjan was not allowed to wear a whistle with a chain,[7] and was not provided with a radio (or some other method of communicating with the outside), in working condition at all times, the jail duty was personally hazardous to him, for he was without basic resources to summon assistance if it were required.

Fasula knew of the problems in the jail in December, 1975. There was no evidence that anything unusual occurred between the time he established the security detail to make hourly checks of the jail, and January 12, 1976, when he assigned Cerjan to the jail, which would warrant the decision to place one deputy in the jail for a full shift. Fasula testified that he knew Cerjan and Johnston were friends, and that he had seen them together on numerous occasions; however, the Court concludes that Cerjan's activities at the dance on January 10, was the necessary impetus for Fasula to finally punish Cerjan for his support of Johnston,

and the jail problems provided the opportunity. Accordingly, the full-time jail duty was spawned as a direct result of Cerjan's activities on January 10, 1976. Further, it was intended to chill the exercise by Cerjan of his First Amendment rights.

■ Fasula's interest in establishing and maintaining good jail security was legitimate. He was not authorized, however, to choose the means he did to pursue that interest when it restricted unnecessarily the constitutionally-protected interests of Cerjan. *Kusper v. Pontikes,* 414 U.S. 51, 58–59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973). See also *Hollifield v. McMahan,* 438 F.Supp. 591 (E.D.Tenn.1977). There were less restrictive alternatives available to Fasula. Deputies could have been assigned to make one-half hour or even quarter-hour checks of the jail. If it were then determined that more security was required, Fasula could have scheduled different deputies to full time shifts in the jail, and rotated them on a nightly or weekly basis.

### III

Cerjan began a two-week vacation on April 5, 1976, which was scheduled to end on April 19, 1976. On April 16, 1976, while on vacation and off duty, Cerjan went to the stationhouse to pick up his paycheck. He was wearing a jacket with the inscription, "JOHNSTON FOR SHERIFF", on the back. The evidence shows that Cerjan walked into the booking area (which was the public area), directly to the counter, and received his paycheck from Audrey Svec. He remained there no more than five minutes, never went behind the counter, and although he was seen by several people, there was no disturbance or commotion. After receiving his paycheck he left the premises.

Consequently, Cerjan received a letter from Chief Deputy Louis[8] on April 19, 1976, informing him he was fired for having

---

7. The Chief Jailer testified that it was standard procedure for deputies to remove handcuffs and weapons prior to entering the jail. He did not recall any deputies removing their whistles and chains.

8. Fasula was vacationing in Florida at this time; however he learned of the incident within minutes when Louis telephoned him.

conducted himself in such a manner as to "diminish the morale and discipline of the Ashtabula County Sheriff's Department, while violating Section III, Paragraph 33 of the Rules and Regulations of the ... Department, ...."

Cerjan contends that his termination was a direct result of his wearing the jacket, which was the exercise of his rights to free speech, assembly and association, and freedom of expression of his political beliefs, in violation of the First and Fourteenth Amendments. Defendants admit that Cerjan was fired because he wore the jacket into the Sheriff's Department, and also that he was on vacation and off duty at the time. However, they contend that their actions were justified because Cerjan was acting in violation of the Rules of the Department, and therefore, there was no abridgment of his First Amendment rights.

Section III, Paragraph 33 of the Rules and Regulations of the Sheriff's Department provides:

> Deputies will not accede to, nor permit their names to be associated with, any advertisement, promotion or other commercial venture whatsoever, nor will they endorse any movement, sect, or ideology in their official capacities as deputy sheriffs.

Clearly, this regulation prohibits certain conduct by deputies while acting in their official capacities. Defendants argue that although Cerjan was on vacation and off duty at the time, picking up his paycheck was an official act because Cerjan was performing a function as a result of his being a deputy sheriff. The Court finds this argument to be without merit. This is especially so in light of the undisputed testimony of Audrey Svec, who distributed deputies' paychecks, that one did not even have to be a deputy sheriff to pick up a paycheck. On many occasions paychecks were given to the wives and other family members of deputies.

The Court finds that Cerjan was not acting in his official capacity as a deputy sheriff when he picked up his paycheck on April 16, 1976. He was fired solely on the basis of the fact that he wore a jacket indicating his support for Fasula's political opponent. This fact is buttressed by the evidence that a number of deputies circulated and solicited signatures on Fasula's "Declaration of Candidacy" petitions while in the office and on duty; and several deputies displayed "FASULA FOR SHERIFF" bumper stickers on their cars which they drove to work and parked in the County lot. No action was ever taken against these deputies. The Court does not accept Fasula's explanation that he took no action against his own supporters because he received no complaints about them.

■ Cerjan's conduct clearly falls within the scope of First and Fourteenth Amendment protection, and the application of the Regulation to his conduct unconstitutionally violated his right to freedom of expression and association. Under the First and Fourteenth Amendments, a non-policymaking employee cannot be dismissed from a job that he is satisfactorily performing solely on the basis of his political beliefs. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

■ It is well settled, however, that the prohibition against the infringement of First Amendment protection is not absolute. Restraints are permitted for appropriate reasons. *Elrod v. Burns, supra; Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As the Supreme Court stated in *Pickering*:

> [I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the ... [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. 391 U.S., at 568, 88 S.Ct., at 1734.

If an employee's private belief interferes with the discharge of his public duty, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). However, as further noted by the Court in *Branti*:

> ... unless the Government can demonstrate 'an overriding interest,' ... 'of vital importance,' ... requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment. 100 S.Ct., at 1293.

In this case, there is no evidence at all that Cerjan was not satisfactorily performing his duties, or that his support of Johnston interfered in any way with the discharge of his duties as a deputy in the Fasula administration. Indeed, his commanding officer, Lt. Peet, and even Fasula, lauded Cerjan's performance and ability as a deputy sheriff.

It may have been desirable and personally important to Fasula to have the political support of his employees, because support for his opponent by one of his deputies could have been construed as a criticism of Fasula, and could well have served to influence members of the general public. However, these personal concerns to Fasula are not cognizable interests that can be weighed in the balancing process against the interests of Cerjan in exercising fundamental rights. Since Fasula was unable to demonstrate any "overriding interests of vital importance", the Court concludes that by firing Cerjan solely on the basis of his "public statement" expressing his political beliefs, Fasula impermissibly contravened one of Cerjan's basic First Amendment rights. See *Hollifield v. McMahan, supra.*

### IV

The termination letter also informed Cerjan of a right to a hearing, upon written request, within ten days. On April 28, 1976, Cerjan sent a letter to Louis requesting a hearing. Fasula advised Cerjan, by letter dated May 11, 1976, that the hearing was set for May 17, 1976, at the Sheriff's office. The day before the scheduled hearing, Cerjan contacted Louis and requested a postponement. At this point, there is a sharp divergence in the testimony. Cerjan testified that upon learning that Fasula would have an attorney present at the hearing, he called Louis to have the date continued; that Louis told him, "no problem", and said he would "get back to" Cerjan. Louis denied Cerjan's account. Instead, he says that once Cerjan delayed the hearing date, the selection of the date was "in his court", and Louis waited for Cerjan to tell him when he wanted a hearing. Finally, Fasula testified he never even knew the hearing was continued.

It is difficult for the Court to believe that Louis waited for Cerjan to set a date for a hearing that was going to be held by Fasula; and Fasula's testimony that he knew nothing of the continuance strains the Court's credulity even more. Fasula signed the letter setting the hearing date, and advised Cerjan to notify him if the time was inconvenient so that an alternative date could be set. Although it is not clear why Cerjan notified Louis instead of Fasula, it is clear, and should go without saying, that Fasula knew that he did not hold a hearing for Cerjan on May 17, or on any other date.

Section VIII of the Rules and Regulations of the Sheriff's Department, mandate the procedures to be followed for "Departmental Charges and Trials", which include prompt investigation of the charges, and a preliminary hearing. None of the procedures were followed in this case.

Louis testified that he saw the jacket when Cerjan came into the office, but he did not know what Cerjan was doing there at the time. Louis then called an attorney to get advice on what action to take, wrote the termination letter and dispatched it, then called Fasula in Florida—after Cerjan had been terminated. Fasula testified that Louis called him prior to terminating Cerjan and that Fasula told Louis to dismiss Cerjan if that were necessary.

The Court views this portion of Louis' testimony as an apparent attempt to take full responsibility for firing Cerjan and will give it no weight at all. The Court finds that Fasula knew in advance that Cerjan would be terminated; he knew the circumstances involved, and he endorsed and encouraged Louis' actions. Further, the Court finds that Fasula knew that the scheduled hearing had been continued, and that no hearing was ever held pursuant to the departmental regulations.

Cerjan contends that this failure to hold a hearing regarding his termination violated his right to due process in violation of the Fourteenth Amendment. It is fundamental that due process safeguards only apply when protected property or liberty interests are shown to exist. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Although a property interest in employment can be created by statute or implied contract (*Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976)), "a person's interest in a benefit is a 'property' interest for due process purposes if there are ... rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann, supra*, 92 S.Ct. at 2699; also see *State ex rel Trimble v. State Board of Cosmetology*, 50 Ohio St.2d 283, 364 N.E.2d 247 (1977).

Although Cerjan had no statutory or contractual guarantee to continued employment which would entitle him to constitutional protection, the Rules and Regulations of the Department provide that "violation of any rules and regulations ... shall be grounds for departmental charges and trials", not grounds for dismissal. Implicit in this provision is the understanding that should an alleged violation of the rules occur, an employee would have an opportunity to have a hearing and refute the charges and retain his employment. On the other hand, if the employee does not refute the charges at the hearing, the rules also provide for suspension of the employee as an alternative to dismissal.

The Court finds that the Rules and Regulations, as promulgated by the Sheriff's Department, provide "rules or mutually explicit understandings" that support Cerjan's claim of entitlement to the benefit of continued employment. Therefore, Cerjan did have a property interest in his employment protected by the due process clause of the Fourteenth Amendment. Accordingly, Fasula's failure to follow departmental regulations and to hold a hearing for Cerjan, violated Cerjan's due process rights as guaranteed by the Fourteenth Amendment.

### V

The relief requested by Cerjan includes back pay and reinstatement to the Public Employees' Retirement Service, with full rights and benefits, during the period under consideration here; compensatory damages for pain, suffering, and mental anguish resulting from deprivation of his rights, and from the jail guard duty; punitive damages; costs and attorney's fees.

### A. Back Pay and Reinstatement

Defendants acknowledge the figure of $8,316 as the amount Cerjan would have earned for the balance of 1976 had he not been fired. A set-off occurred of Cerjan's other income during that period, and the parties have agreed that the amount of $6,300 plus 8% prejudgment interest, or $8,064, is the amount of back pay to which he is entitled. Accordingly, the Court holds that Cerjan is entitled to recover of the defendants the amount of $8,064 in back pay.

Since the purpose of the reinstatement remedy is to place the plaintiff in the position he would have been in had the constitutional violation not occurred (*Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)), the Court holds that Cerjan is also entitled to reinstatement to the Sheriff's Department of Ashtabula County, for the limited purpose of benefits which would

have accrued in the Public Employees' Retirement System during the balance of 1976.

### B. Compensatory Damages

██ The compensable elements of a § 1983 damage award are not limited to out-of-pocket expenses but may also include emotional and mental distress. *Glasson v. City of Louisville,* 518 F.2d 899 (6th Cir. 1975); *Donovan v. Reinbold,* 433 F.2d 738 (9th Cir. 1970); *Vetters v. Berry,* 575 F.2d 90 (6th Cir. 1978).

#### 1. The Jail Duty

██ Cerjan testified to his feelings of degradation and humiliation as a result of spending his shift in jail. He described his feelings of defenselessness when required to use the same toilet facilities as the inmates with no privacy or protection; and his feeling of helplessness when the hostage memorandum was posted by Fasula, because he thought the staff knew of a possible situation coming up of which he was not made aware. He further testified to his feeling of being punished by Fasula, and of his inability to spend evenings and weekends with his two small children because of his working hours.

The Court finds that Cerjan did suffer emotional distress, humiliation, and embarrassment, as a direct result of Fasula's placing him in the jail guard duty. Fasula is liable, in both his individual and official capacities, to Cerjan in the amount of $1,000 for this infringement of Cerjan's First Amendment rights.

#### 2. The Termination

██ Cerjan's testimony regarding his termination shows that his reaction ranged from initial shock and hurt pride to a genuine concern about how he would care for his family. He had mortgage payments, a car note, and no health insurance. He explained his difficulty and embarrassment when looking for a job and having to explain to a prospective employer that he had been fired from his last job. Further, Cerjan described his feelings of humiliation at

having "let his family down" when his wife was required to take a job as a waitress; and what he termed as personality changes at home which manifested themselves in arguments with his wife of 13 years, and harsher discipline toward his children. Although Cerjan expressed concern about his reputation in the community, there was no evidence showing that his reputation was in any way affected.

Accordingly, the Court finds that as a direct consequence of being terminated in violation of his constitutional rights to freedom of speech and association, Cerjan did suffer emotional distress, humiliation and embarrassment. Therefore, Cerjan is entitled to recover of defendants the amount of $5,000 for this deprivation.

#### 3. The Failure to Hold a Hearing

██ Cerjan presented no evidence of injury of any kind as a result of the failure to hold a hearing on his termination. However, as the Supreme Court noted in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978):

> Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, ... the denial of procedural due process should be actionable for nominal damages without proof of actual injury. 435 U.S. at 266, 98 S.Ct. at 1054.

Accordingly, Cerjan is entitled to recover of defendants the sum of $1.00 as nominal damages for the due process violation.

### C. Punitive Damages

██ In order to recover punitive damages under § 1983 the plaintiff must prove by a preponderance of the evidence that defendant acted with a wanton and malicious disregard for his constitutional rights. *Paton v. LaPrade,* 524 F.2d 862 (3rd Cir. 1975); *Vetters v. Berry,* 575 F.2d 90 (6th Cir. 1978).

■ The Court is of the opinion that Cerjan has sustained this burden. The evidence shows that Fasula consistently acted in bad faith and for improper motive from the time of the meeting on November 14, 1975, until the time that Cerjan was terminated in April, 1976. In particular, Fasula's decision to create the jail duty only two days after the FOP dance, and to place Cerjan in the jail and keep him there longer than the normal shift rotation; and his decision to terminate Cerjan for wearing the jacket supporting Johnston while Cerjan was on vacation, and taking no action against his own supporters; all evidence bad faith, and a wanton disregard for the constitutional rights of Cerjan.

"Punitive damages are imposed in § 1983 actions primarily for their effect on defendant, and to vindicate the public interest in deterring malicious or wanton conduct by public officials." *Aumiller v. University of Delaware*, 434 F.Supp. 1273 (D.Del.1977). The Court concludes that the public interest would be served by an award of punitive damages against Raymond Fasula in this case. Accordingly, the Court finds Raymond Fasula liable to Cerjan for punitive damages in the amount of $3,000.

### D. Attorney's Fees

At the conclusion of the trial, the Court granted plaintiff's motion for attorney's fees, with direction to submit documentation to enable the Court to determine the amount to be awarded. Although defense counsel was granted leave to file a Memorandum with respect to attorney's fees, it was never filed.

Plaintiff's counsel have submitted a Memorandum and affidavits requesting attorney's fees in the amount of $13,039, for a total of 203.25 hours. The fees for the three lawyers are broken down as follows:

1.  Edward Siegel, with 6 years experience (2 of which were with a corporate law firm and the balance with a major corporation), bills 94.75 hours at $60 per hour;

2.  David Cleveland, with 5 years experience (3 of which were with Legal Aid Society and the balance in private practice), bills 52.25 hours at $60 per hour; and

3.  Gordon Beggs of the ACLU, with 6 years experience, specializing in civil liberties and civil rights matters, bills 56.25 hours at $75 per hour.

Counsel also submitted an affidavit from their "expert" regarding, *inter alia*, the prevailing rates for attorneys in cases of this type, which is stated to range from $50 to $150 per hour. Additionally, counsel is requesting the Court to apply a multiplier to the requested fees because the recovery of a fee in this case was contingent on success.

■ At the outset, the Court will deny counsel's request for a multiplier to the fee award. This is one of those cases where the "facts . . . [were] strong and the law clear", and there was little risk of losing involved. *Northcross v. Board of Ed. of Memphis City Schools*, 611 F.2d 624 (6th Cir. 1979). Therefore, the Court's determination of the reasonable billing rate for counsel will be adequate compensation herein.

Mr. Siegel has been involved in this case since January, 1977; Mr. Cleveland became involved on July 20, 1979; and Mr. Beggs entered the case on May 30, 1980. A review of the affidavits reveals that from May 1, 1980 through the end of the trial of this cause on August 14, 1980, there was an overlapping or duplication of services provided by the three attorneys. Therefore, the Court will apply a 5% reduction factor to the hours billed from May 1, 1980, and a 10% reduction factor for the time billed for trial. The Court is using a higher reduction factor for trial time because the trial, which lasted only 1½ days, involved no unusually complex issues which would require the services of three attorneys.

Taking into consideration the qualifications, experience and expertise of the attorneys, as well as the fact (as stated above) that this was not a complex case, the Court finds the reasonable hourly rate for Mr. Siegel and Mr. Cleveland to be $40 per hour

for office services[9], and $50 per hour for the trial. Because Mr. Beggs is more experienced in the area of civil liberties and civil rights, the Court finds his reasonable hourly rate to be $50 per hour for office services and $60 per hour for trial time.

Therefore, the total compensation to be awarded to the attorneys, using the rates and the reduction factors the Court has found to be reasonable, is $8,606, computed as follows:

*Mr. Siegel*: 72.75 hours office time (1/77–5/1/80), at $40 per hour, totaling $2,910; 10 hours office time (after 5/1/80), less 5% duplication reduction, totaling 9.5 hours at $40 per hour, $380; 12 hours trial time, less 10% reduction, totaling 10.8 hours at $50 per hour, totaling $540. Mr. Siegel is hereby awarded a total of $3,830.

*Mr. Cleveland*: 12.5 hours office time (7/79–5/1/80), at $40 per hour, totaling $500; 26.25 hours office time (after 5/1/80), less 5% reduction, totaling 24.95 hours at $40 per hour, totaling $998; 12 hours trial time, less 10% reduction, totaling 10.8 hours at $50 per hour, totaling $540. Mr. Cleveland is hereby awarded a total of $2,038.

*Mr. Beggs*: 44 hours office time, less 5% reduction, totaling 41.8 hours, at $50 per hour, totaling $2,090; 12 hours trial time, less 10% reduction, totaling 10.8 hours, at $60 per hour, totaling $648. Mr. Beggs is hereby awarded $2,738 as attorney's fees.

Accordingly, defendants are directed to pay the total sum of $8,606 to plaintiff's attorneys for their fees, and the sum of $132.08 for the costs and expenses of plaintiff's attorneys.

IT IS SO ORDERED.

---

9. Office services, as used here, include interviewing, researching, briefing, depositions, and travel time.